FILED

CLERK U.S. DISTRICT COURT
TAMPA, FLORIDA

2004 APR 27  PM 12: 32

# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

### TAMPA DIVISION

JOHN RODERICK HELLER, III and ) **CASE NO. 8:03-CV-1011-T-17-EAJ**
ALAN L. WURTZEL, on behalf of themselves ) **(Consolidated)**
and all others similarly situated, )
                    )
         Plaintiffs, )
                    )
    vs. )
                    )
MERCEDES WALTON, GERALD F. MAASS, )
JILL M. TAYMANS, EDWARD )
MODZELEWSKI, FREDERICK C.S. WILHELM,)
WANDA D. DEARTH, JUNIOR WINOKUR, )
DANIEL D. RICHARD, RONALD RICHARD, )
CHARLES F. NYBERG, JOHN V. HARGISS, )
CRYO-CELL INTERNATIONAL, INC., )
WEINICK SANDERS LEVENTHAL & CO., LLP)
And MIRSKY FURST & ASSOCIATES, P.A., )
                    )
         Defendants. )

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR
## JURY TRIAL FOR VIOLATION OF FEDERAL SECURITIES LAWS



- i -

3.     Defendants try to mitigate the damage done by the February 3, 2003 St. Petersburg Times article by making additional false and misleading statements. ............................................................................85

D.     The Company Fails To Disclose Material Aspects Of Its PharmaStem Litigation ..............................................................................................92

E.     Additional Scienter Allegations .......................................................94

F.     Defendant WS' Participation In The Fraud ....................................97

VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: .......................................115

VII.  NO SAFE HARBOR ...........................................................................................117

VIII. CAUSES OF ACTION ........................................................................................118

A.     COUNT I:  Violation Of Section 10(b) Of The Exchange Act Against And Rule 10b-S Promulgated Thereunder Against All Defendants .............................118

B.     COUNT II:  Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants ..............................................................................121

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ...................................................................1

II.  JURISDICTION AND VENUE ..............................................................2

III. PARTIES ...........................................................................................2

IV.  CLASS ACTION ALLEGATIONS ........................................................6

V.   SUBSTANTIVE ALLEGATIONS.........................................................8

　　　A.   Background ...............................................................................8

　　　B.   Cryo-Cell's Financial Statements During The Class Period Were Materially
　　　　　False And Misleading .............................................................13

　　　　　1.   Cryo-Cell's improper recognition and reporting of revenue..................14

　　　　　2.   Cryo-Cell's admission that it issued false financial statements during the
　　　　　　　class period .........................................................................24

　　　　　3.   Cryo-Cell's improper recognition and reporting of other income..........27

　　　　　4.   Cryo-Cell's improper recognition and reporting of enrollment fees .......37

　　　　　5.   Cryo-Cell's failure to timely reserve for uncollectible receivables .........38

　　　　　6.   Cryo-Cell's failure to correct previously issued financial statements.....45

　　　　　7.   Failure to disclose contingent liabilities and significant risks and
　　　　　　　uncertainties .......................................................................46

　　　　　8.   False and misleading internal and disclosure control statements and
　　　　　　　management certifications...................................................56

　　　C.   Cryo-Cell's Technology Which Was The Basis Of Its Business Model Did Not
　　　　　Work ........................................................................................64

　　　　　1.   Defendants' public statements touting the competitive advantage gained
　　　　　　　through the use of the CCEL-II unit ......................................66

　　　　　2.   The problems with the CCEL-II unit are exposed. ...............................79

Lead Plaintiffs, Martin Hodas, Kenneth D. Thompson and Troy C. Griffin ("Plaintiffs"), individually and on behalf of all other persons similarly situated[1], by the undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cryo-Cell International, Inc. ("Cryo-Cell" or the "Company") (NASDAQ: CCELL and CCELE), information readily obtainable on the Internet, and interviews with various sources with personal knowledge.   Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     This is a federal securities class action brought by the Plaintiffs on behalf of themselves and a Class consisting of all other persons who purchased the publicly traded securities of Cryo-Cell between March 16, 1999 and May 20, 2003, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Act").

---

[1]      Martin Hodas, Kenneth D. Thompson and Troy C. Griffin were appointed Co-Lead Plaintiffs by Order dated February 17, 2004.

## II.   JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §§ 1331 and 1337.

4.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this district. Additionally, the Company maintains its principal executive offices in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

6.     Plaintiffs purchased Cryo-Cell securities, as set forth in the accompanying certifications attached hereto and incorporated herein by reference, and have suffered damages as a result of the wrongful acts of Defendants as alleged herein.

7.     Defendant Cryo-Cell is a corporation organized under the laws of Delaware with its principal place of business located within this judicial district at 3165 McMullin Booth Road, Building B, Clearwater, Florida 33761.

8.     Defendant Weinick Sanders Leventhal & Co., LLP ("WS") is a public accounting firm located in New York City, New York. During the Class Period, Defendant WS

issued false and misleading clean audit opinions with respect to Cryo-Cell's financial statements, which were included in the Company's public reports filed with the SEC. WS is the successor firm to Defendant Mirsky, Furst and Associates, P.A.

9.      Defendant Mirsky, Furst and Associates, P.A. ("Mirsky Furst") is a public accounting firm located in Fort Lee, New Jersey. During the Class Period, Defendant Mirsky Furst issued false and misleading clean audit opinions with respect to Cryo-Cell's financial statements, which were included in the Company's public reports filed with the SEC.

10.     Defendant Mercedes Walton ("Walton") has been a member of Cryo-Cell's Board of Directors since October of 2000, and has been Chairwoman of the Board since June of 2002.  She has also been the Interim CEO since April 10, 2003.

11.     Defendant Gerald F. Maass ("Maass") has been Cryo-Cell's Vice President, General Manager and Director from 1998 to the present.

12.     Defendant Jill M. Taymans ("Taymans") has been Cryo-Cell's Chief Financial Officer since May of 1998 to the present.

13.     Defendant Edward Modzelewski ("Modzelewski") was a member of Cryo-Cell's Board of Directors from 1996 to August, 2003.  During this time, he was a member of the Board's Audit Committee.

14.     Defendant Frederick C. S. Wilhelm ("Wilhelm") was a member of Cryo-Cell's Board of Directors from 1989 until August, 2003.  During this time, he was a member of the Board's Audit and Executive Committees.

15.     Defendant Junior Winokur ("Winokur") was a member of Cryo-Cell's Board of Directors from 2000 until his resignation on December 31, 2001.

16.     Defendant Charles D. Nyberg ("Nyberg") has been a member of Cryo-Cell's Board of Directors since August, 2001.  During this time, he has been a member of the Board's Audit Committee.

17.     Defendant Wanda D. Dearth ("Dearth") was Cryo-Cell's President, Chief Executive Officer, and a member of Cryo-Cell's Board of Directors from June 2000 until she was terminated on December 19, 2001.

18.     Defendant Daniel D. Richard ("D. Richard") was Cryo-Cell's Chief Executive Officer and Chairman of the Board from the formation of the Company until he resigned on June 18, 2002. Additionally, Defendant D. Richard was the Company's founder and Chief Executive Officer of the Company's majority-owned subsidiary, Stem Cell Preservation Technologies ("SCPT").

19.     Defendant Ronald Richard ("R. Richard") was a member of Cryo-Cell's Board of Directors from January, 2001 until August, 2003.  He was also the Chief Executive Officer of the Company's majority-owned subsidiary, SCPT.

20.     Defendant John C. Hargiss ("Hargiss") is and was, at all relevant times during the Class-Period, Cryo-Cell's Chief Executive Officer and a member of Cryo-Cell's Board of Directors from June 18, 2002 to April 8, 2001.

21.     Defendants Walton, Maass, Taymans, Modzelewski, Wilhelm, Dearth, Winokur, Nyberg, D. Richard, R. Richard, and Hargiss are collectively referred to hereafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Cryo-Cell, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22.     Each of the Individual Defendants is liable as a direct participant with respect to a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Cryo-Cell common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Cryo-Cell's business, operations, management, and the intrinsic value of Cryo-Cell common stock and caused Plaintiff and other members of the Class to purchase Cryo-Cell securities at artificially inflated prices.

23.     In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

24.     The Individual Defendants, because of their positions with Cryo-Cell, were provided with copies of Cryo-Cell's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

25.    The Individual Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein

### IV.    CLASS ACTION ALLEGATIONS

26.    Plaintiffs bring this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased the securities of Cryo-Cell during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cryo-Cell securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

28.    Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

29.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class actions and securities litigation.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this action since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

31.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

c. Whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

d. Whether the Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; and

e.  Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

32.   Cryo-Cell was incorporated on September 11, 1989 in the state of Delaware. Cryo-Cell is in the business of collecting, processing, and cryogenically storing umbilical cord blood stem cells for possible later medical use by the individuals whose cells are stored, or by their closely-related family members.  Umbilical cord blood contains a rich supply of stem cells, which have been found to have a variety of medical uses. Expectant mothers receive Cryo-Cell's Collection Kit, and, upon giving birth, a blood sample is retrieved from the umbilical cord and sent to Cryo-Cell's Clearwater, Florida laboratory.  The sample is then processed, tested for infectious diseases, the stem cells contained within the sample are separated out from the rest of the material, and the stem cells are cryogenically stored in bar-coded cryovials in a liquid nitrogen-cooled unit at approximately -320 degrees Fahrenheit.  Should it ever become necessary, the stem cells can be retrieved from cryostorage and used in certain medical procedures. According to the Company, it is the fastest growing commercial firm currently specializing in separated umbilical cord blood stem cell preservation for autologous/sibling use.

33.   Plaintiffs allege that Defendants disseminated false and misleading statements to the investing public with respect to Cryo-Cell's financial results and business operations. More specifically, during the Class Period, the Company issued statements that failed to disclose and/or misrepresented the following adverse facts, among others: (1) that the Company had materially overstated its revenues, net income and earnings per share;

- 8 -

(2) that the Company recognized revenue in violation of Generally Accepted Accounting Principles ("GAAP"), and in some cases, the Company's own internal accounting policies, with respect to the following: (a) Revenue Sharing Agreements; (b) revenue recognition for the sale of Area Licenses and (c) storage and licensing fees; (3) that the Company in violation of GAAP failed to set reserves for uncollectible receivables; (4) that the Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company; (5) that the technology that was the basis of the Company's business model did not function and was therefore incapable of driving the business model to success; and (6) that the Company's financial results were materially overstated at all relevant times.

34.    Plaintiffs also allege that Defendants WS and Mirsky Furst issued false and misleading clean audit opinions with respect to Cryo-Cell's financial statements, which were included in the Company's public reports filed with the SEC, and therefore were they themselves participants in the fraudulent scheme.

35.    The Class Period commences on March 16, 1999. On this date, the Company filed with the SEC its Form 10-KSB annual report for the fiscal year ended 1998. The form was signed by Defendants, D. Richards, Taymans, Modzelewski, Maass, and Wilhelm. Therein, the Company began (if it had not already begun) improperly reporting its financial results and business prospects. This practice continued throughout the Class Period, as detailed below.

36.    The following graphs show the correlation between significant adverse announcements during the Class Period, and a concomitant sharp decrease in Cryo-Cell's stock price and increase in trading volume.



**Graph 1:**    The *St. Petersburg Times* reported on February 3, 2003, that samples held at Cryo-Cell's Clearwater, Florida facilities are unsafe and unsecure.  On February 3, 2003, the price of Cryo-Cell stock fell 26.5% on exceptionally high volume.  On February 4, 2003, Cryo-Cell denies the allegations in the *St. Petersburg Times* article. On February 4, 2003, the stock price rebounded on very high volume upon Cryo-Cell's rebuttal.



Exhibit C-3: On April 16, 2003, Cryo-Cell announces possible restatements of historical financial statements and delays the filing of its 10Q

Page 1

**Graph 2:** On April 16, 2003 Cryo-Cell announced that it was delaying the filing of its 10-QSB and that it was expecting to re-state its financials. The stock price fell 11.1%.

- 11 -



Exhibit C-4: On April 23, 2003, Cryo-Cell announced further delays in the filing of its 10Q

Page 1

**Graph 3:** On April 23, 2003, Cryo-Cell further delayed the filing of its Form 10-QSB and the price of its stock fell 10.6%.



**Graph 4:**    After the market closed on May 20, 2003, Cryo-Cell announced that Ernst & Young had resigned as Cryo-Cell's auditor.  This caused the stock price to fall 13.8% on May 21, 2003 on heavy trading.

**B.      Cryo-Cell's Financial Statements During The Class Period Were Materially False And Misleading**

37.    At all relevant times during the Class Period, Cryo-Cell represented that its financial statements were prepared in accordance with GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented.  Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

38.     Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

39.     The representations by Defendants that Cryo-Cell's financial statements were prepared in accordance with GAAP were materially false and misleading because the Defendants engaged in fraudulent accounting practices which materially inflated the Company's operating results during the Class Period.

### 1.     Cryo-Cell's improper recognition and reporting of revenue

40.     During the Class Period, Cryo-Cell's reported "revenues" were generated primarily from fees associated with (1) its U-Cord program; and (2) Revenue Sharing Agreements ("RSA"s).

41.     Pursuant to GAAP, revenue should not be recognized until it is (1) realized or realizable and (2) earned.[2]   Concepts Statement 5, ¶¶ 83-84; Accounting Research Bulletin 43, Chapter 1A, ¶1; Accounting Principles Board's ("APB") Opinion 10, ¶ 12.

---

[2]     Concepts Statement 5, paragraph 83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its on-going major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." (footnote reference omitted).   Paragraph 84(a) continues "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." (footnote reference omitted).   In addition, paragraph 84(d) states that "If services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may be recognized as earned as time passes."

42.    On December 3, 1999, the SEC staff issued Staff Accounting Bulletin ("SAB")

No. 101 providing expanded guidance on GAAP's principles of revenue recognition after

studies on financial reporting, such as the 1999 Committee of Sponsoring Organizations

(COSO) Report, indicated that a significant number of fraudulent financial reporting

cases involved improper revenue recognition.

43.    Pursuant to SAB No. 101, revenue generally is realized or realizable and earned

when all of the following criteria are met:

     a.  Persuasive evidence of an arrangement exists;

     b.  Delivery has occurred or services have been rendered;

     c.  The seller's price to the buyer is fixed or determinable; and

     d.  Collectibility is reasonably assured.

44.    SAB No. 101 also provides a detailed interpretation of each of the above-noted

criterion mentioned above.  For example, concerning the rendering of services, SAB No.

101 states:

> Supply or service transactions may involve the charge of a nonrefundable
> initial fee with subsequent periodic payments for future products or
> services.   The initial fees may, in substance, be wholly or partly an
> advance payment for future products or services.  In the examples above,
> the on-going rights or services being provided or products being delivered
> are essential to the customers receiving the expected benefit of the up-
> front payment.  Therefore, the up-front fee and the continuing performance
> obligation related to the services to be provided or products to be
> delivered are assessed as an integrated package.  In such circumstances,
> the staff believes that up-front fees, even if nonrefundable, are earned as
> the products and/or services are delivered and/or performed over the term
> of the arrangement or the expected period of performance and generally
> should be deferred and recognized systematically over the periods that
> the fees are earned.  [Footnote references omitted]

45.   In its audited fiscal 1998 financial statements (which were audited by WS), accompanying its Form 10-KSB filed with the SEC on March 16, 1999 and signed by Defendants, D. Richard, Maas, Taymans, Modzelewski and Wilhelm, Cryo-Cell disclosed:

> The Company recognizes revenue from ***cellular storage ratably over the contractual storage period*** and processing fees upon the completion of processing.
>
> Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured.
>
> In fiscal 1997, the majority of revenues were generated from the sale of a Revenue Sharing Agreement.   In fiscal 1998, all of the revenue was generated from the processing and storage of the U-Cord specimens.

(Emphasis Added.)

46.   Similarly, in its audited fiscal year 1999 financial statements (which were audited by WS), accompanying its Form 10-KSB filed with the SEC on February 28, 2000, and signed by Defendants, D. Richard, Maas, Taymans, Modzelewski and Wilhelm, Cryo-Cell disclosed:

> The Company recognizes revenue from ***cellular storage ratably over the contractual storage period*** and processing fees upon the completion of processing.
>
> Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured.
>
> In fiscal 1998, all of the revenue was generated from the processing and storage of the U-Cord specimens. In fiscal 1999, $500,000 was recognized as revenue from the sale of a partial State Revenue Sharing Agreement.   The remainder of the revenue was generated from the processing and storage of the U-Cord specimens.

(Emphasis Added.)

47.    In its audited fiscal year 2000 financial statements (which were audited by WS),

accompanying its Form 10-KSB filed with the SEC on March 14, 2001 and signed by

Defendants, D. Richard, Dearth, Maas, Taymans, Modzelewski, Wilheim, Winokur,

Walton, R. Richard, Cryo-Cell disclosed:

> The Company recognizes revenue from **cellar _storage_ ratably over the contractual storage period** and from processing fees upon the completion of processing.

> Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured.

> In fiscal 1999, $500,000 was recognized as revenue from the sale of a partial State Revenue Sharing Agreement.  The remainder of the revenue was generated from the processing and storage of the U-Cord specimens.  In fiscal 2000, $465,000 was recognized from the sale of the European marketing rights of the Company's U-Cord program to COLTEC, Ltd. and the Company has received $1,400,000 for a renewable licensing agreement, with respect to this transaction (See Note 7).

(Emphasis Added.)

48.    In its audited fiscal year 2001 financial statements (which were audited by WS),

accompanying its Form 10-KSB filed with the SEC on March 15, 2002 and signed by

Defendants, D. Richard, Hargiss, Maas, Taymans, Modzelewski, Wilhelm, Nyberg,

Walton and R. Richard, Cryo-Cell disclosed:

> The Company recognizes revenue from **cellar _storage_ ratably over the contractual storage period** and from processing fees upon the completion of processing.

> Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured.  In fiscal 2001 and 2000, $720,454 and $465,000, respectively, were recognized as income from the sale of the marketing rights of the Company's U-Cord program to CRYOC (formerly COLTEC, Ltd., an affiliated company).  In 2001 the Company sold an exclusive territorial license for Mexico, Ecuador and Central America for $600,000.  As the obligations of the Company have been completed at November 30,

2001, the Company has recognized $500,000 in other income and the balance will be recorded in operations in fiscal 2002. The license is for an initial term of two years and is renewable at the licensee's discretion in perpetuity. The Company also sold an exclusive license for the territory of Israel and the territory of Turkey and the Middle East. This licensee has the option to cancel the Turkey and Middle East portion of the license until October 2002 while the Israeli portion is non-cancelable.  As the obligations of the Company have not been performed at November 30, 2001, the entire $1,000,000 has been reflected as unearned income.  In 2001, the Company sold a 37.5% interest in a revenue sharing agreement to two investors affiliated with the Company for the State of Texas for $750,000, all of which was recognized in revenue in fiscal 2001.

(Emphasis Added.)

49.     In its audited, fiscal year 2002 financial statements (which were audited by WS),

accompanying its Form 10-KSB filed with the SEC on February 28, 2003 and signed by

Defendants, Hargiss, Taymans, Walton, Modzewski, Wilhelm and Nyberg, Cryo-Cell

disclosed:

The Company records as Revenue income from processing and storage of specimens and income from revenue sharing agreements.  The Company recognizes revenue from processing fees upon the completion of processing and *cellular __storage__ fees ratably over the contractual storage period*.  Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured.

The Company records as Other Income sales of marketing rights and royalty income from such rights.  In fiscal 2002 and 2001, $235,000 and $700,000, were recognized as other income from the sale of marketing rights of the Company's U-Cord program to CCEU.  In 2001 the Company sold an exclusive territorial license for Mexico, Ecuador and Central America for $600,000.  As the obligations of the Company have been completed the Company recognized $500,000 in other income in fiscal 2001 and the balance was recorded in fiscal 2002.  The license is for an initial term of two years and is renewable at the licensee's discretion in perpetuity.  The Company also sold an exclusive license for the territory of Israel and the territory of Turkey and the Middle East.  This licensee had the option to cancel the Turkey and Middle East portion of the license and apply the initial deposit toward the Israeli portion of the contract.  The licensee opted to cancel the Middle East and Turkey license and the Company reduced each of its receivable and unearned income by

$500,000.  The Company modified the terms of the original license, (see Note 10) resulting in an additional reduction in receivables and deferred revenues of $400,000.  As the Company's obligations under the agreement have been completed the Company recognized $100,000 as other income in fiscal 2002.

(Emphasis Added.)

50.     As noted in paragraphs 45-49 above, in each of its fiscal 1998, 1999, 2000, 2001 and 2002 audited financial statements, Cryo-Cell publicly disclosed accounting policies of revenue recognition from its *storage fees* as *ratably over the contractual storage period*.

51.     On June 27, 2003, Cryo-Cell filed its amended fiscal 2002 financial statements with the SEC.[3]  In its amended fiscal 2002 financial statements, filed with the SEC on Form 10-K after the end of the Class Period, *Cryo-Cell admitted that it violated its own publicly stated policy of revenue recognition* and GAAP when it disclosed:

The Company has historically generated revenue through the sale of the U-Cord™ *storage* program to customers including annual renewal fees. *The Company charges a fee for* the initial blood collection kit sent to the expectant parents, the processing of the umbilical cord blood and the extraction of the stem cells for storage, and the first year's *storage* of the stem cells.  Thereafter, the client is charged an *annual fee to store* the specimen.  *In the Company's prior report the Company recognized the revenue from the first year's storage and the recurring annual storage fee at the time of receipt.  The Company is amending and restating the prior report to initially record the annual storage fees as a deferred liability and to recognize the revenue over the twelve-month period covered by the annual storage fee.*

(Emphasis Added.)

---

[3]     In its amended fiscal 2002 financial statements, Cryo-Cell repeated the disclosure noted in paragraph 49, except that the disclosure "Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured," was deleted.

52.   Accordingly, Cryo-Cell has admitted that, in violation of GAAP, it recognized storage fee revenue at the time of *receipt and not ratably* over the life of contractual service period *as disclosed in its audited Class Period financial statements*. Indeed, each of Cryo-Cell's audited financials statements during the Class Period disclosed that it recognized *storage fee revenues* "*ratably over the contractual storage period*."

53.   Cryo-Cell's on-going violation of its publicly disclosed accounting policy during the Class Period by recognizing storage fee revenue at the time of *receipt* rather than over the life contractual service period evidences the Defendants' attempt to mislead investors.

54.   Indeed, GAAP, in APB Opinion No. 22, ¶7, provides that *the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company*. Moreover, GAAP states that *information about the accounting policies* adopted by a reporting company is *"essential"* for financial statement users.  (APB Opinion No. 22, ¶ 8).

55.   Cryo-Cell's recognition of storage fee revenue was, as it has now admitted, in direct contravention of its publicly disclosed accounting policy and evidences the Defendants' intent to deceive investors and overstate the Company's operating performance during the Class Period.

56.   Moreover, Defendants knew or recklessly ignored that Cryo-Cell otherwise violated GAAP's criteria for revenue recognition during the Class Period (see paragraphs 45-49).  For example, as noted in its audited financial statements during the

- 20 -

Class Period, Cryo-Cell recognized revenue when it "entered into" an RSA and "the payment pursuant to the agreement has been satisfactorily assured."

57.    This policy violated GAAP because Cryo-Cell did not earn such revenue at the time it was recognized.  As noted in the SEC's SAB No. 101:

> Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services.    The initial fees may, in substance, be wholly or partly an advance payment for future products or services.  In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment.  Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package.  In such circumstances, the staff believes that ***up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance*** and generally should be deferred and recognized systematically over the periods that the fees are earned.

(Emphasis Added and Footnotes Omitted.)

58.    Accordingly, Cryo-Cell's recognition of revenue at the time it entered into RSAs violated GAAP because, at such time, Cryo-Cell had not performed under the agreement and had not substantially accomplished what it must have done to be entitled to the benefits represented by the revenues.  Indeed, even prior to the SEC's issuance of SAB No.101, GAAP otherwise provided that Cryo-Cell's recognition of revenue on its RSA was improper.  See, e.g., the AICPA's Technical Practice Aids ("TPA") §5100.08.

59.    In its amended fiscal 2002 financial statements, Cryo-Cell also admitted that its policy of revenue recognition on RSAs during the Class Period violated GAAP:

> The Company has entered into Revenue Sharing Agreements ("RSAs") with individuals and entities for specific geographic areas.    The Company's RSAs provide that in exchange for an up-front payment, the

Company would share in perpetuity a percentage of its future revenue derived from the annual storage fees charged related to a certain number of specimens that originated from specific areas.  To date, the Company has entered into four RSAs covering the following states: New York, Texas, Florida and Illinois (including contiguous states) and Tenet Health Systems Hospitals, Inc.  The Company did not enter into any RSAs in fiscal 2002.  *In the Company's prior reports the up-front payment received for each RSA was recognized as revenue when the RSA was entered into and the payment under the agreement was reasonably assured*.  Based upon guidance sought by management from the staff of the Office of the Chief Accountant of the SEC, *the Company is amending and restating the prior report to record this up-front payment as a long-term liability*.

(Emphasis Added.)

60.    Contrary to GAAP and SEC Rules, during the Class Period, Cryo-Cell improperly recognized millions of dollars in revenue that it had not earned.  By employing the above noted improper accounting practices, Cryo-Cell, to the detriment of unsuspecting investors, reported illusory demand for its services and revenue during the Class Period, as Defendants knew or recklessly ignored.

61.    Indeed, the egregiousness of the Company's accounting during the Class Period is otherwise evident by the actions of Ernst & Young, LLP ("E&Y").  On March 11, 2003, the Company's Board of Directors and Audit Committee dismissed Defendant WS and engaged E&Y to serve as the Company's independent auditors.  *After being engaged only two months*, *E&Y resigned*, on May 13, 2003, *prior to completing any financial statement audit or quarterly reviews, over concerns it had with "the fairness and reliability of previously issued [Cryo-Cell] financial statements."*

62.    In a Form 8-K filed with the SEC on May 20, 2003, Cryo-Cell disclosed:

Specifically, in connection with a review of the Company's condensed consolidated financial statements for the three month period ended February 28, 2003, which E&Y commenced but was unable to complete prior to its resignation, *E&Y raised questions to management and the*

**Audit Committee with respect to the Company's historical accounting treatment of stem cell storage fees and revenue sharing agreements (RSAs)**. First, E&Y questioned whether the Company's recognition of revenue for annual storage fees received from customers at the time of receipt was in conformity with generally accepted accounting principles. E&Y expressed its belief that such annual storage fees should be accounted for by initially recording a deferred liability with revenue recognized ratably over the period covered by the annual storage fee. The Company concurs with E&Y with respect to the treatment of such storage fees, and intends to restate prior period financial statements as soon as possible with respect to this matter.

Second, with respect to the RSAs, E&Y questioned whether the Company's historical accounting practice of immediately recognizing revenue at the time the RSA was entered into was in conformity with generally accepted accounting principles. Upon review, the Company concurs with E&Y that the amount of each RSA should not be recognized immediately as revenue. However, the Company continues to evaluate the proper accounting treatment for its RSAs. Due to E&Y's resignation, E&Y did not expand the scope of its review or conduct further investigation to reach a definitive conclusion as to the proper accounting treatment related to the Company's RSAs.

In May 2003, the Company initiated a discussion with the staff of the Office of Chief Accountant of the Securities and Exchange Commission to assist the Company in its determination of the proper accounting treatment for the RSAs.

(Emphasis Added.)

63.     As noted above, the SEC's Office of the Chief Accountant agreed with E&Y's position on how revenue from the Company's RSAs should be recognized. Indeed, Defendants knew or recklessly disregarded that Cryo-Cell's practice of improper revenue recognition during the Class Period was in direct contravention of its stated accounting policy and GAAP, and could have served no purpose other than to manipulate the Company's reported operating results. As a result of its improper accounting practices, Cryo-Cell's financial reporting during the Class Period was materially misstated.

## 2.   Cryo-Cell's admission that it issued false financial statements during the class period

64.    As a result of its improper reporting, Cryo-Cell has restated its 2001 annual and 2002 annual and interim financial statements.   In addition, Cryo-Cell's financial statements prior to beginning of fiscal 2001 were also materially misstated.[4]   In order to account for such misstatements, Cryo-Cell restated its "retained earnings" balance at December 1, 2000 (the first day of fiscal 2001).[5]   Indeed, *the magnitude of the misstatements of Cryo-Cell's financial statements prior to the beginning of fiscal 2001 is evidenced by the fact that it has now reduced its retained earnings balance at December 1, 2000 (the first day of fiscal 2001) by more than 38.9%*.   In other words, *Cryo-Cell has now admitted that its true accumulated earnings from its inception through December 1, 2000 were overstated by approximately 64%*.

65.    The following tables illustrates certain of the effects of the Defendants' manipulation of the Company's Class Period financial statements:

### YEAR ENDED NOVEMBER 30, 2001

|  | As Reported ($1,000s) | As Restated ($1,000s) | % overstated (understated) |
|---|---|---|---|
| Revenues | $ 5,649 | $ 4,516 | 25.1% |
| Gross Profit | $ 3,992 | $ 2,967 | 34.5% |
| Operating Loss | $    486 | $ 1,354 | (64.1)% |

---

[4]    As a "small business issuer," (defined by 17 C.F.R 228 Subpart A Item 10), Cryo-Cell was not required to restate its financial statements prior to 2001, notwithstanding the fact that such financial statements were also materially misstated.

[5]    Cryo-Cell's retained earnings at December 1, 2000 represented its accumulated earnings from its inception through such date. See, e.g., Joel G. Siegel & Jae K. Shim, Barron's, *Dictionary of Accounting Terms*,(2d ed.  1995), ISBN 0-8120-1918-0, page 349.

|  | As Reported ($1,000s) | As Restated ($1,000s) | % overstated (understated) |
|---|---|---|---|
| Net Income (Loss) | $ 900 | $ (131) | N/A |
| Cash Flow From Operations | $ 1,258 | $ 469 | 168.1% |

### QUARTER ENDED FEBRUARY 28, 2002

|  | As Reported ($1,000s) | As Restated ($1,000s) | % overstated (understated) |
|---|---|---|---|
| Revenues | $ 1,485 | $ 1,408 | 5.4% |
| Gross Profit | $ 931 | $ 891 | 4.5% |
| Income (loss) before minority interest and equity in earnings of affiliates | $ 284 | $ 232 | 22.7% |
| Net Income (Loss) | $ 46 | $ (6) | N/A |

### QUARTER ENDED MAY 31, 2002

|  | As Reported ($1,000s) | As Restated ($1,000s) | % overstated (understated) |
|---|---|---|---|
| Revenues | $ 1,792 | $ 1,647 | 8.9% |
| Gross Profit | $ 1,202 | $ 1,093 | 10.0% |
| Marketing, general & administrative expenses | $ 1,486 | $ 1,596 | (11.1)% |
| Operating Loss | $ 356 | $ 643 | (44.6)% |
| Net Loss | $ 273 | $ 622 | (56.1)% |
| Cash Flow From Operations[6] | $ 561 | $ 361 | 55.4% |

---

[6]   The data concerning operating cash flow is for the six months ended May 31, 2002.

## QUARTER ENDED NOVEMBER 30, 2002

| | As Reported ($1,000s) | As Restated ($1,000s) | % overstated (understated) |
|---|---|---|---|
| Revenues | $ 1,901 | $ 1,792 | 7.9% |
| Gross Profit | $ 1,165 | $   977 | 19.2% |
| Operating Loss | $ 3,717 | $ 4,344 | (14.4)% |
| Net Loss | $ 3,559 | $ 4,263 | (16.5)% |

## YEAR ENDED NOVEMBER 30, 2002

| | As Reported ($1,000s) | As Restated ($1,000s) | % overstated (understated) |
|---|---|---|---|
| Revenues | $ 7,073 | $ 6,694 | 5.7% |
| Gross Profit | $ 4,578 | $ 4,289 | 6.7% |
| Operating Loss | $ 5,537 | $ 5,963 | (7.1)% |
| Net Loss | $ 5,328 | $ 6,048 | (11.9)% |
| Cash Flow From Operations | $   202 | $   193 | 4.5% |

66.    Indeed, as set forth above, the Company's fraudulent revenue recognition practices resulted in the restatement of numerous income statement line items during the Class Period.   As a result, the demand for Cryo-Cell's services, as well as its operating performance, during the Class Period was materially overstated.

67.    Cryo-Cell was motivated to overstate its reported revenue because, as GAAP in FASB's EITF Abstract No. 99-19 notes:

- 26 -

How companies report revenue for goods and services they offer has become an increasingly important issue because some investors may value certain companies on a multiple of revenues rather than a multiple of gross profit or earnings.

### 3.    Cryo-Cell's improper recognition and reporting of other income

68.    Cryo-Cell's improper financial reporting did not stop with the restatement of its previously issued financial statements.   In addition to the improper financial reporting noted above, Cryo-Cell's financial statements otherwise violated GAAP.

69.    ***Cryo-Cell's reported earnings continued to be overstated even after the filing of its restated fiscal 2002 and 2001 year end financial statements.***   As noted in paragraph 49 above, Cryo-Cell disclosed that it reports the sale of licensing and marketing rights, along with any royalty income associated with such rights as "Other Income."   In fiscal 2000, 2001 and 2002, Cryo-Cell recognized and reported as Other Income approximately $465,000, $1,200,000 and $435,000 respectively, from the sale of licensing and marketing rights, or $2,200,000 in the aggregate.   During that same time frame, the Company also reported approximately $486,000 in royalty income associated with such licensing and marketing rights.

70.    In its fiscal 2000 Form 10-KSB, Cryo-Cell reported:

On April 6, 2000, the Company entered into a renewable agreement with COLTEC, Ltd. for the exclusive license to market the Company's U-CORD program in Europe.  The marketing rights allow COLTEC, Ltd. to directly market the U-CORD program, sell revenue sharing agreements or further sub-license the marketing rights throughout Europe.   The Company received $1,400,000 in cash and licensing fees of 10.5% to 20% of adjusted U-CORD processing and storage revenues to be generated in Europe, and granted COLTEC, Ltd. a three year option to purchase 100,000 shares of the Company's common stock ($8.00 exercise price) and will issue up to 100,000 additional options ($12.00 exercise price), as needed, to facilitate sales of sub-licensing and/or revenue sharing agreements in Europe.   The company recognized $465,000 of the licensing fees in 2000.   Subsequent to the licensing agreement date,

> ***COLTEC, Ltd. formed a corporation, CRYO-CELL Europe, B.V. to engage in the cryogenic cellular storage business under the agreement***. At September 19, 2000 the Company entered into an agreement to purchase approximately 6% of CRYO-CELL Europe, B.V. In October and November 2000, the Company paid $1,000,000 for 38,760 shares of the capital stock of CRYO-CELL Europe, B.V. which the Company owned on January 24, 2001.

(Emphasis Added.)

71.    During fiscal 2001 and 2002, the Company also recognized and reported as Other Income similar sales of licensing and marketing rights agreements covering the geographic areas of Israel/Middle East and Mexico/Central America (see paragraphs 48-49, above).

72.    Cryo-Cell's recognition of revenue on such transactions violated GAAP and SEC Rules because the Company recognized revenue which it had not earned and had not substantially performed the obligations which entitled it to the benefits represented by the revenue.

73.    As alleged in detail below, during the Class Period, Cryo-Cell's U-Cord technology, although touted by Cryo-Cell as the lynchpin of its superiority as a cellular storage company, was, in reality, not functional or commercially viable and constantly malfunctioned. In fact, it was an abysmal failure. In an attempt to mask these ultimately insurmountable problems and lend credibility to its U-Cord technology, ***Cryo-Cell improperly recognized revenue in excess of $2.5 million on the sale of the rights and royalties associated with such technology, as Defendants knew or recklessly ignored***. In so doing, Defendants materially overstated the operating results of Cryo-

Cell and misleadingly validated the false representations Defendants made about the U-Cord technology.[7]

74.   For example, in January 2001, Cryo-Cell Europe wrote letters to Cryo-Cell's Board of Directors complaining about defects with the Cryo-Cell technology licensed to it.[8] *In fact, Cryo-Cell Europe was so dissatisfied with Cryo-Cell's technology that it attempted to rescind its agreement with Cryo-Cell. Nonetheless, Cryo-Cell continued to recognize millions of dollars in income on the sale of rights associated with such technology.*

75.   Indeed, on October 17, 2002, Marc Waeterschoot, then CEO of Cryo-Cell Europe, sent the following letter to Cryo-Cell's Board of Directors:

> We were very surprised to receive recently a letter from the CEO, on behalf of the Company. We feel that we should clarify our position in regard of the License Agreement of April 6th 2000.
>
> We would hereby like to refer to the letter that Cryo-Cell Europe ('CC EU') wrote on *31rst (sic) of January 2001* to Cryo-Cell International Inc ('CC INC'). *In this letter more or less the same arguments were set forth as we will explain further in this letter.*
> *No action* on the part of CC INC *was taken. In this letter CC EU rescinded the Agreement and held CC INC liable* of (sic) all damages. We consider that CC INC agreed with the position taken in our letter.

---

[7]   The Israel/Middle East licensing agreement, entered into in August 2001, was to pay Cryo-Cell a $1,000,000 licensing fee plus a royalty on every sample stored (the Company subsequently disclosed that the Middle East portion of the Agreement was dropped). However, according to Dr. Brenda Freidlander, a principal of Cryo-Cell Israel, Cryo-Cell Israel paid only $200,000 to Cryo-Cell and nothing more. According to Dr. Friedlander, Cryo-Cell Israel stored all of its samples with Cryo-Cell Europe rather than Cryo-Cell. Accordingly, as related by Dr. Friedlander, Cryo-Cell Israel decided to pay royalties to Cryo-Cell Europe, not Cryo-Cell. According to Dr. Friedlander, Defendant D. Richard "palmed us off to CC Europe which thus became our 'foster home,'" and Cryo-Cell Europe "noted almost from day one to C.C. Int. [Cryo-Cell] that they were the ones handling our 'franchise' problems with regard to most issues, being it legal, marketing or lab-wise." Dr. Friedlander further related that Cryo-Cell Israel and Cryo-Cell Europe were apparently both sold the rights to the country of Turkey. These material facts, which were necessary to make Cryo-Cell's representations concerning its licensing Agreements with Cryo-Cell Israel and Cryo-Cell Europe not misleading, were never disclosed to investors.

[8]   Cryo-Cell's fiscal 2000 Form 10-KSB disclosed that Cryo-Cell Europe was formed by COLTEC, Ltd. to engage in the cryogenic cellular storage business under Cryo-Cell's agreement with COLTEC.

Although this letter was sent in January 2001, a first payment was made by CC EU to CC INC. This *payment was made in good faith, because we were promised that everything*, including the robotic storage device, would be made available at once.

*A second payment was made in August because*, as a result of tough negotiations, an equity position in CC EU was taken by CC INC. *At that time*, again, the payment was made in good faith because *we were promised that CC INC would provide us with everything we asked for* within the shortest delay.

In the Agreement, it is clearly stated that CC INC should provide Cryo-Cell Europe ('CC EU') with the following:
- Marketing ideas and support
- Commercial Information
- Scientific information
- Technical know-how on how to set up a lab
- Administrative procedures
- Proper Standard Operational Procedures
- A guide to accreditation
- Information from other affiliates
- Any information on regulatory issues in possession of CC INC.
- A working patented robotically operated storage device
- A state of the art software (sic)

*Until today none of the above was provided*.

- Not any marketing plan was communicated.

- When asked for scientific references to stem cells, the answer was: we are not a research company. An attempt to get information from Saneron took about 1 year and revealed nothing of any importance that was not already published, although they announced that they are working on the expansion of stem cells.

- We never had a visit from the lab-director of CC INC. Although we invited him several times, the visit never took place.

- Concerning the SOPs: we received an old, out of date, not actual booklet. These SOPs were not consistent with the procedures that were used at the time. Different copies, baring the same version numbers, had different contents. The existing SOPs would never have allowed CCI to apply for any accreditation.

- As for the storage device CCEL II: *the machine was delivered to CC EU in June 2001. This is 6 months after the ultimate period that*

- 30 -

*was set forth in the Agreement.*   For each month of delay in delivering the machine, the License Fees would be lowered by 1%.  At least, that is how we negotiated the deal.  (Unfortunately this is not the way it was put in the contract.)

*Until today the machine is not working up to the standards that were agreed upon and that are generally accepted.*

*Moreover, today the machine that was shown to us in the CC INC lab in Clearwater is not working either.*  If our information is correct, only 1100 samples are stored in the machine.  Some samples might even [have] been lost!

*The whole intellectual property of CC INC was based on this technology, which proves to be not working, unreliable and for the time being, impossible to validate.*

*Since the machine is still not in working order, we could deduct 1% per month from the License Fees.  Therefore no License Fees would have to be paid!*

– The software that is currently in use is out of date, too complicated and does not interact with the software of the CCEL II.

Geographical Marketing rights

The License Agreement states: "Marketing rights for Europe."   In the document it was clearly agreed that the Agreement would be valid for the territory of Geographical Europe."

Although this is very easy to determine and to verify, we learned afterwards that another License Fee was sold, which included the European part of Turkey.[9]  (The biggest and most populated part of Istanbul lies in Europe).

Also Russia seems to be promised to another group.

Regulatory affairs

*When we recently applied for an authorisation (sic) to operate CC INC France, we were shocked to learn that a few years ago CC INC already made an application, which was rejected by the Government. Although CC INC was aware of this situation, the License Agreement for Europe was sold to us for [$1,400,000], including France and without telling us about the regulatory problems.*

Affiliates

---

[9]      [As set forth in the footnote to paragraph 73, above, the marketing rights to Turkey were also sold by Cryo-Cell to Cryo-Cell Israel.]

Currently **CCEU is handling and storing the samples from CC Middle East**. The reason for this is that this Licensee did not get any of the above mentioned items as set out in the Agreement either.

**They can confirm that they did not get any support from CC INC, and therefore turned to CC EU for help**.
We could therefore argue to have them pay the License Fees to CC EU instead of CC INC.

Technology transfer

In many telephone calls and emails, different suggestions were made by CC EU in order to improve the existing methodologies, software and techniques.

None of those suggestions were even taken into consideration.

When John Hargiss took over the daily business, things started to change. From then on, a constructive dialogue became possible. During these contacts we have shown the different projects we are working on.

We have shown since then that:

- **we had to develop our own software** (which is much more powerful, easier to validate, cheaper and easier to maintain).
- it is probably Good Laboratory Practice to store the stem cells into two vials at a different location. CC EU who (sic) offers this at no extra cost. This policy is now being followed by CC INC.
- CC INC is now in the process of offering this at an extra cost to the clients.
- we have been working and (sic) on a new separation technology based on a membrane separation, made commercially available by a Japanese company. CC EU will start implementing this system during the month of October. CC INC is looking to introduce this system later on.
- we are working towards an accreditation according [to] the standards set out by FACT (Foundation for the Accreditation of Cellular Therapy). **Because no accreditation existed in CC INC we had to develop our own standards**.
- we have suggested the introduction of a new cap-design which would reduce the need for storage capacity by 33 % and would avoid database retrieval of QC-samples.
- we are setting up an international accessible database for scientific articles.
- we are implementing a barcoded identification for use throughout the lab

All this information and [these] suggestions have been made available to CC INC free of charge, showing our willingness to cooperate in a friendly and constructive way.

***Taking into account all the arguments set out here above, we think that CC INC has not delivered the items that are mentioned in the License Agreement.*** We had to invest a lot more financial and human resources than what was presented to us at the signing of the Agreement.

Therefore, we consider CC INC to be in breach of contract.

[signed]

Marc Waeterschoot
Clinical Pathologist
CEO Cryo-Cell Europe NV

(Emphasis Added.)

76.   On November 2002, Marc Waeterschoot of Cryo-Cell Europe sent a  follow-up

letter to Cryo-Cell's Board of Directors and Defendant Walton:

Dear Mrs. Walton,

Referring to our meeting on November 15th in Breda, where we discussed about the license agreement between our both companies, ***we would like to make the following comments on the statements you made in the presence of several witnesses***:

- –  you stated that you attended the meeting as President of the Board of Directors of Cryo-Cell International and that you were mandated and sent by the Board of Directors of CC Int.
- –  ***you acknowledged having received our letter, dated January 3lrst (sic) 2001, in which the license agreement was revoked if the conditions set out in our letter were not met***
- –  at this moment you say that the letter is not official because it was sent to 'Dear Sir'
- –  the license agreement does mention a start date for delivering the patented robotically operated machine (hereafter referred to as CCEL II)
- –  ***you acknowledged the fact the CCEL II was not delivered in the period that was mentioned in the License Agreement***
- –  ***you acknowledged that our machine, after having had two major mechanical updates, is still not in working order***

- 33 -

- *you acknowledged that the CCEL II in your lab (Clearwater, Florida) contains only [1,100] samples out of the total of [42,000] samples collected by CC Int. and that <u>the machine has not been used since at least three years</u>*
- *you acknowledged the fact that the necessary SOPs were not handed over because CC Int is in the process of completing them in order to try to obtain a necessary accreditation by AABB*
- you asked us if we would be interested in acquiring a lot of items (like cost analysis, marketing plans, detailed procedures, access to some experts, validation of the .CCEL II etc...).   As you will understand, we feel that we should have gotten all these items in due time
- *you acknowledged the fact that after January 31st 2001 we made one small payment.  This payment was made in good faith because we were promised to get all the items, that were promised, in time*
- you vigorously denied the fact that the CEO of the company engaged [in] some talks about a possible merger between the two companies
- you acknowledged the fact that in October 2001 CC Int bought an option to acquire 60% of our company and paid [17,500] shares
- *you explicitly threatened us that if we would not agree to pay the license fees that were due, you would start a legal procedure, that CC Int would immediately start operations in Europe itself and we should cease to use the brand-name Cryo-Cell*
- *you explicitly told us that the legal procedure would be very costly, that CC Int has several millions of dollars in the Bank and hence the procedure would be in favour (sic) of CC Int.*
- *you told us that a solution could only be found if we agreed to the deal presented by you*, prior to any negotiation
- this deal explicitly called for payment of all amounts due without any possibility to (sic) negotiation.  *You told us explicitly that the Board would not except [sic] any negotiation on this matter*
- the discussion we had on Friday November 15th was supposed to be friendly and constructive.  However we found your presence very hostile and anything but constructive: all matters had to [be] settled that same day because of the end of the fiscal year of CC Int. is November 30th
- in a negotiation, both parties are supposed to meet each other somewhere half way

This is the way we (all persons present: Kees Kleinbloesem - COO, Johan Goossens, Gilbert Verhoef - CFO and Marc Waeterschoot - CEO ) understood the facts that you presented to us.

You will understand that the proposal that you made to us verbally should be transmitted to us in writing. This topic was discussed and we are still awaiting your proposal.
We assume that you can agree on the content of the facts that we have outlined above.

If you do not comment on this we shall assume that this is a correct representation of the facts.

[signed]

Klin Biol. Marc Waeterschoot
CEO - Cryo-Cell Europe NV

(Emphasis Added.)

77.    Despite its obvious and specific knowledge of the abject failure of its CCELII

technology, Cryo-Cell improperly recognized millions of dollars of income associated

with the "sale" of rights to use its U-Cord technology in violation GAAP and SEC Rules.

In fact, in its Form 10-QSB for the quarter ended May 31, 2001, Cryo-Cell disclosed:

> On April 6, 2000, the Company entered into a renewable agreement with COLTEC, Ltd. for the exclusive license to market the Company's U-Cord™ program in Europe. The marketing rights allow COLTEC, Ltd. to directly market the U-Cord program, sell revenue sharing agreements or further sub-license the marketing rights throughout Europe. The Company received $1,400,000 in cash for the marketing license and will receive licensing fees of 10.5% to 20% of adjusted U-Cord processing and storage revenues to be generated in Europe, and granted COLTEC, Ltd. a three year option to purchase 100,000 shares of the Company's common stock ($8.00 exercise price) and will issue up to 100,000 additional options ($12.00 exercise price) as needed, to facilitate sales of sub-licensing and/or revenue sharing agreements in Europe. ***The Company recognized $465,000 of the licensing fees in fiscal 2000 and $350,000 as of May 31, 2001.*** Subsequent to the licensing agreement date, COLTEC, Ltd. formed a corporation, CRYO-CELL Europe, B.V. to engage in the cryogenic cellular storage business under the agreement. On September 19, 2000, the Company entered into an agreement to purchase approximately 6% of CRYO-CELL Europe, B.V. In October and November 2000, the Company paid $1,000,000 for 38,760 shares of the capital stock of CRYO-CELL Europe, B.V. that the Company owned on January 24, 2001.

(Emphasis Added.)

78.     Accordingly, **_Cryo-Cell improperly recognized in excess of $800,000 in revenue on the licensing arrangement before it even delivered the technology to Cryo-Cell Europe!_** Incredibly, $350,000 of this revenue was recognized after the company had received a letter from Cryo-Cell Europe notifying the Company that it was rescinding the agreement.  As noted in the SEC's SAB No. 101, revenue generally is realized or realizable and earned when all of the criteria set forth therein has been met and when delivery has occurred or services have been rendered.  Indeed SAB No. 101 provides:

> The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement.   Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

79.     Cryo-Cell's recognition of revenue on the "sale" of licensing and marketing rights and royalties associated with such rights violated GAAP because Cryo-Cell had not substantially performed the obligations which entitled it to the benefits represented by the revenue.  Specifically, Cryo-Cell had not earned such revenue given the remaining and unfulfilled contractual obligations at the time the revenue was recognized.  Indeed, given the state of Cryo-Cell's technology, it was unable to satisfy its contractual obligations because it could not deliver a CCEL II that worked.  Moreover, Cryo-Cell's recognition of revenue on such transactions violated GAAP because the collectibility of such revenue was not reasonably assured when recognized.

80.     Nonetheless, in furtherance of its deceptive accounting practices, Cryo-Cell has improperly failed to restate its previously issued erroneous financial statements to correct its improper reporting of the "sale" of marketing rights and any related royalties during the Class Period.

### 4.     Cryo-Cell's improper recognition and reporting of enrollment fees

81.     During the first quarter of fiscal 2003, Cryo-Cell reported that it "changed" its method of recognizing revenue on "enrollment" fees.  Indeed, ***prior to such time, and in violation of GAAP, Cryo-Cell's financial statements had not even disclosed the existence of or the revenue recognition accounting policy associated with its enrollment fees***.

82.     In its interim financial statements for quarter ended February 28, 2003 filed on Form 10-QSB with the SEC on July 15, 2003, Cryo-Cell disclosed[10]:

> During the first quarter of 2003, the Company changed it method of recognizing enrollment fee revenue.  Through November 30, 2002, the Company recognized enrollment fees upon the completion of the enrollment into the U-Cord storage program.  Beginning December 1, 2002, enrollment fees and related direct incremental costs associated with these fees are being deferred and recognized once the processing of specimens is completed.  Had the accounting treatment been in effect, the accumulated deficit would have been $102,000 greater than previously reported as of November 30, 2002.  The cumulative impact of this change, including the impact of approximately $20,000 in the current period, has been recorded in the quarter ended February, 28, 2003.  Management does not think that the impact of this adjustment is material to the November 30, 2002 financial statements (as restated) or to the projected operating results and earnings trends for the year ending November 30, 2003.

---

[10]     When it filed its notification of late filing, Cryo-Cell disclosed, "The Company's Quarterly Report on Form 10-QSB for the quarter ended February 28, 2003 cannot be filed within the prescribed time period without unreasonable effort or expense because the Company and its audit committee are reviewing, in conjunction with its new auditor, the recording of revenue associated with the Company's revenue sharing agreements and annual stem cell storage fees. The Company currently intends to file its Form 10-QSB within five calendar days from the date hereof or as soon as practicable following resolution of the pending revenue recognition issues."

83.   Cryo-Cell's recognition of enrollment fee revenue upon enrollment into its storage program violated GAAP, because it is similar to its RSA revenue, Cryo-Cell's revenue was not earned until the processing of its specimens was completed.  As Robert A. Bayless, then Chief Accountant of the SEC's Division of Corporation Finance said in a meeting to the Silicon Valley Chapter of Financial Executives International in San Jose, California on September 18, 2001:

> So SAB 101 says that even if the cash is in your pocket and you will never have to give it back, *it's not revenue for accounting purposes until the earnings process is complete.  The earnings process isn't selling memberships, and it isn't setting up the data base or installing a customer's connection to the data base.  The earnings process is keeping the health club open during the membership period, and keeping the data base accessible to subscribers throughout the contract term*.   In these arrangements, *the up-front payments shouldn't be recognized as revenue, because the contract deliverable of value to the customer is a service to be delivered in the future, over a period of time*.

(Emphasis Added.)

84.   Accordingly, Cryo-Cell's recognition of enrollment revenue at the time of enrollment violated GAAP.   In yet another deception by Defendants, Cryo-Cell has deceptively disclosed that it "changed" its method of recognizing enrollment fee revenue and has accounted for such "change" as being one among two accounting principles that are generally accepted.   As noted above, Cryo-Cell's method of recognizing its enrollment fee revenue during the Class Period was not generally accepted and violated GAAP.   Defendants attempt to whitewash its improper accounting for and financial reporting of enrollment fees revenue violated GAAP and further evidences Defendants attempt to deceive investors.

### 5.   Cryo-Cell's failure to timely reserve for uncollectible receivables

85.    In its fiscal 1999 Form 10-KSB, Cryo-Cell disclosed:

On November 30, 1999, the Company entered into agreements with two investors entitling them to on-going shares in a portion of the Company's net storage revenue generated by specimens originating from within the state of New Jersey.   Deposits totaling $50,000 were received upon signing of the agreements and *the remaining $450,000, due in __May 2000, is recorded as a receivable__*.   When the $450,000 is received by the Company the investors will be entitled to a portion of net storage revenues generated to a maximum of 33,000 storage spaces.

(Emphasis Added.)

86.    As noted above, the Company's recognition of $500,000 in fees from this Revenue Sharing Agreement violated GAAP because such "revenue" was not earned when recognized.   In addition, Cryo-Cell's recognition of such revenue was improper because the sales price was not reasonably assured when recognized.   In furtherance of their scheme to misrepresent the Company's operating results, the Defendants compounded Cryo-Cell's misleading accounting and reporting of revenue by failing to timely and adequately reserve for uncollectible receivables.

87.    GAAP requires that financial statements account for existing uncertainties as to probable losses.   Such loss contingencies should be recognized and reported as a charge to income when: information existing at the date of the financial statements indicates that it is probable (e.g., a likely chance) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated. FASB's Statement of Financial Accounting Standards ('SFAS') No. 5, ¶ 8.

88.    Indeed, SFAS No.5 requires an entity's bad debt reserve to reflect, at a given point in time, the estimated probable loss inherent in the entity's accounts receivable. On the balance sheet, the reserve is deducted from total accounts receivable (an asset of the entity) so that the resulting figure represents the net realizable value (i.e., the

amount estimated to be collectible).  On the income statement, periodic increases in the reserve are reflected as charges against earnings.  SFAS No. 5 further provides that events that occur subsequent to the balance sheet date, but prior to the issuance of the financial statements, provide additional evidence with respect to conditions that existed on the balance sheet date and affect the estimates inherent in the process of preparing financial statements.

89.    On or about July 14, 2000, Cryo-Cell filed its financial statements for the quarter ended May 31, 2000 with the SEC on Form 10-QSB.  The Form 10-QSB was signed by Defendant, D. Richard.  In such filing, Cryo-Cell disclosed:

> On November 30, 1999, the Company entered into agreements with two investors entitling them to on-going shares in a portion of CRYO-CELL's net storage revenue generated by specimens originating from within the state of New Jersey.  Deposits totaling $100,000 have been received and the remaining $400,000 due in November 2000, is recorded as a receivable.  When the Company receives the $400,000 the investors will be entitled to a portion of net storage revenues generated to a maximum of 33,000 storage spaces.

90.    Notwithstanding the fact that its $400,000 receivable on the above transaction was due in "November 2000," in violation of GAAP, Cryo-Cell failed to adequately reserve for such uncollectible receivables in its financial statements for the quarter ended May 31, 2000.

91.    On or about September 13, 2000, Cryo-Cell filed an amendment to its May 30, 2000 Form 10-QSB.  The Amended Form 10-QSB was signed by Defendant, D. Richard.  Such amendment repeated the disclosure and accounting contained in Cryo-Cell's original May 30, 2000 Form 10-QSB for the above transaction.

92.    In its "audited" financial statements for the year ended November 30, 2000, Cryo-Cell disclosed:

On November 30, 1999, the Company entered into agreements with two investors entitling them to on-going shares in a portion of CRYO-CELL's net storage revenue generated by specimens originating from within the state of New Jersey.   Deposits totaling $50,000 were received upon signing of the agreements and the remaining $450,000, was originally due in May 2000.   *In May 2000 the original due date for the remaining balance was extended to April 2001.*   As of November 30, 2000 the remaining balance due is $380,000.  Upon receipt of the balance due the investors will be entitled to a portion of net storage revenues generated to a maximum of 33,000 storage spaces.

(Emphasis Added.)

93.    Accordingly, in its fiscal 2000 year end financial statements (filed with the SEC on or about *March 14, 2001* with its Form 10-KSB), Cryo-Cell, disclosed that the due date of the receivable on the above transaction was purportedly "extended" to April 2001, even though its May 30, 2000 financial statements, filed with the SEC in July 2000 and September 2000, failed to disclose such material event.

94.    Notwithstanding any purportedly extended due date, GAAP required that such receivable be reserved for and charged against earnings.   As Defendants knew or recklessly disregarded, it was improper for Cryo-Cell to ostensibly justify not recording a reserve and charge against earnings on such long outstanding uncollected receivable by simply and purportedly extending its due date from May 2000 to April 2001.

95.    In its financial statements for the quarter ended February 28, 2001 filed with the SEC on Form 10-QSB on April 13, 2001, Cryo-Cell repeated the disclosure that the due date of the above receivable had been extended to April 2001.  The Form 10-QSB was signed by Defendant, D. Richard.

96.    The egregiousness of Cryo-Cell's improper accounting for its uncollectible receivable on the above transaction did not stop with the passing of the "extended" April 2001 due date.

97.     In its May 30, 2001 financial statements filed on Form 10-QSB with the SEC on

July 13, 2001 and signed by Individual Defendant, D. Richard, Cryo-Cell falsely

disclosed:

> On November 30, 1999, the Company entered into agreements with two
> investors entitling them to on-going shares in a portion of CRYO-CELL's
> net storage revenue generated by specimens originating from within the
> state of New Jersey.  Deposits totaling $50,000 were received upon
> signing of the agreements and the remaining $450,000 was originally due
> in May 2000. *In May 2000 the original due date for the remaining
> balance was extended to <u>August 2001.</u>*  As of May 31, 2001 the
> remaining balance due is $370,000.  Upon receipt of the balance due the
> investors will be entitled to a portion of net storage revenues generated to
> a maximum of 33,000 storage spaces.

(Emphasis Added.)

98.     Defendants knew or recklessly ignored that Cryo-Cell's May 30, 2001 financial

statements were false and misleading because they failed to reflect a reserve for the

Company's uncollectible receivable.  Moreover, Defendants knew or recklessly ignored

that their disclosure that "In May 2000 the original due date for the remaining balance

was extended to *August* 2001," was false and misleading because the Company had

previously disclosed that such purported due date was extended to *April*, 2001.

99.     In its August 31, 2001 financial statements accompanying its Form 10-QSB filed

with the SEC on October 12, 2001 and signed by Defendant, D. Richard, Cryo-Cell

falsely disclosed:

> On November 30, 1999, the Company entered into agreements with two
> investors entitling them to on-going shares in a portion of CRYO-CELL's
> net storage revenue generated by specimens originating from within the
> state of New Jersey.  Deposits totaling $50,000 were received upon
> signing of the agreements and the remaining $450,000 was originally due
> in May 2000. *In May 2000 the original due date for the remaining
> balance was extended to <u>November 2001</u>*. As of August 31, 2001 the
> remaining balance due is $370,000. Upon receipt of the balance due the

> investors will be entitled to a portion of net storage revenues generated to a maximum of 33,000 storage spaces.

(Emphasis Added.)

100.   Defendants knew or recklessly ignored that Cryo-Cell's August 31, 2001 financial statements were false and misleading because they failed to reflect a reserve for the Company's uncollectible receivable.  Moreover, Defendants knew or recklessly ignored that their disclosure that "In May 2000 the original due date for the remaining balance was extended to **November** 2001," was false and misleading because the Company had previously disclosed that such purported due date was extended to **April** and **August** 2001.

101.   In its "audited" financial statements for the year ended November 30, 2001 (which were audited by WS), filed with the SEC with its Form 10-KSB on or about March 15, **2002**, Cryo-Cell disclosed:

> On November 30, 1999, the Company entered into agreements with two investors entitling them to on-going shares in a portion of CRYO-CELL's net storage revenue generated by specimens originating from within the state of New Jersey. Deposits totaling $50,000 were received upon signing of the agreements and the remaining $450,000, was originally due in May 2000.  In May 2000 the original due date for the remaining balance was extended to April 2001. **As of November 30, 2001 the remaining balance due is $370,000**.  Upon receipt of the balance due the investors will be entitled to a portion of net storage revenues generated to a maximum of 33,000 storage spaces.

(Emphasis Added.)

102.   Defendants knew or recklessly ignored that Cryo-Cell's fiscal year end 2001 financial statements were false and misleading because they failed to reflect a reserve for the above receivable which had remained uncollected for more than **two years**.

103.   Cryo-Cell's financial statements for the quarters ended February 28 and May 30, 2002 accompanying the Company's Form 10-QSB filed with the SEC on April 15, 2002 and July 19, 2002, respectively, were also materially false and misleading in that they failed to reflect a reserve for the above noted uncollectible receivable.  The Form 10-QSB filed April 15, 2002 was signed by Defendant D. Richard and the Form 10-QSB filed July 19, 2002 was signed by Defendant Hargiss.   In addition, such financial statements deceptively omitted disclosure about the status of the receivable.

104.   On October 21, 2002, after the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the Company filed its financial statements for the quarter ended August 31, 2002 with the SEC on Form 10-QSB.  With respect to the New Jersey Revenue-Sharing Transaction, the Company reported:

> As of August 31, 2002, the Company received $130,000.  The agreement originally required the notes to be paid in full by May 31, 2000.  The Company had extended the payment terms of these notes to August 31, 2002.   The Company did not receive the final payment due.   In conversations with the two investors, the Company was informed that they were unable to pay the notes.   The Company is in the process of foreclosing and has deemed this receivable to be uncollectible.   The remaining balance due under the terms of the contract has been fully reserved and charged to operations.

105.   In full recognition of Cryo-Cell's uncollectible accounts receivable, Defendants allowed hundreds of thousands of worthless accounts receivable to remain on the Company's books in order to avoid making a charge against earnings.  Notwithstanding the Defendants' awareness of the true collectiblity of Cryo-Cell's receivables, the Company improperly failed to adequately reserve for its uncollectible receivables until after the enactment of Sarbanes-Oxley when it filed its August 31, 2002 financial statements.

106.   In so doing, Defendants engaged in conscious, or at least reckless wrongdoing by participating in the repeated dissemination of public statements that misrepresented and concealed true facts concerning the collectiblity of Cryo-Cell's accounts receivable.

###   6.   Cryo-Cell's failure to correct previously issued financial statements

107.   GAAP, in APB Opinion No. 20, provides that when a company decides to make a change between two or more generally accepted accounting principles, its financial statements disclose the justification for the change and why the change is preferable. Moreover, such accounting changes require the filing of a preferability letter by the SEC registrant's independent accountant pursuant to Item 601 of Regulation S-B (17 CFR 228.601).   No such disclosure was provided by Cryo-Cell or its auditor concerning the "change" in recognizing the Company's enrollment fee revenue.

108.   Indeed, neither Cryo-Cell nor Defendant WS, its then current auditor, has provided such disclosure because the Company's initial method of recognizing enrollment fee revenue was not in accordance with GAAP.   Nonetheless, Cryo-Cell has failed to restate its previously issued false and misleading financial statements, as required by GAAP, specifically APB Opinion No. 20, to correct its improper recognition of enrollment fee revenue.[11]

109.   In addition, when Cryo-Cell restated its fiscal 2001 and 2000 year-end financial statements, it improperly failed to correct its improper accounting for and financial

---

[11]      To the extent that Cryo-Cell's Class Period financial statements may not have been restated to correct its improper accounting of enrollment fee revenue because Defendants did not think that the impact of the adjustment is material, the SEC'S SAB No. 99 on materiality provides "[i]f the misstatement of an individual amount causes the financial statements as whole to be materially misstated, that effect cannot be eliminated by other misstatements whose effects may be to diminish the impact on other financial statement items.  To take an obvious example, if a registrant's revenues are a material financial statement item and they are materially overstated, the financials statements taken as a whole will be materially misleading even if the effect on earnings is completely offset by an equivalent overstatement of expenses." (Emphasis Added.)

reporting of the income it reported on the "sale" of its marketing rights. Similarly, Cryo-Cell failed to restate its fiscal 2001 year-end financial statements to correct its improper accounting for and financial reporting of its uncollectible receivables noted above.

### 7.   Failure to disclose contingent liabilities and significant risks and uncertainties

110.   Defendants attempt to deceive investors during the Class Period is otherwise evidenced by the failure of Cryo-Cell's financial statement to disclose its contingent liabilities in conformity with GAAP.

111.   GAAP requires that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred. SFAS No. 5, ¶ 10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made. Id.

112.   The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it issued Article 10-01 of Regulation S-X (17 C.F.R. § 210.10-01), which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, **except that** "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

113.   In addition, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business. American Institute of Certified Public Accountant's Statement of Position No. 94-6.

114.   In violation of GAAP, Cryo-Cell's Class Period financial statements improperly failed to disclose the problems with its U-Cord technology.  Indeed, at least as early as January 2001, *Cryo-Cell's Board of Directors was put on notice by Cryo-Cell Europe about the problems with its U-Cord program*.   In fact, *the French government precluded Cryo-Cell from employing its technology in that country*. Moreover, as will be set forth below, the Company and the Individual Defendants, the Company's officers and directors, were made well aware of the serious deficiencies in the Company's CCEL II technology by the catastrophic failures of such technology at the Company's laboratory in Clearwater, Florida.   The CCEL II technology was the bedrock upon which the Company's marketing and investor relations efforts were grounded.  In failing to provide the disclosure required by GAAP, Cryo-Cell materially mislead investors about its U-Cord technology and the materially adverse contingencies associated with it, as Defendants knew or recklessly ignored.

115.   In fact, in its financial statements for the quarter ended August 31, 2002, Cryo-Cell deceptively disclosed:

> On September 26, 2002, the Company sent a letter to CRYO-CELL Europe, B.V. advising that CC-E was in default under the terms of the license agreement for failure to pay royalty fees.   Based upon actual revenues since inception through July 2002, the Company is entitled to $350,585 in royalty fees.  Two payments were made in fiscal 2001 to the Company totaling $57,181 leaving a balance due of $293,404.   On October 2, 2002, the Company received a letter from CC-E stating that the Company had not fulfilled its obligations under the licensing agreement. As of August 31, 2002, a reserve of $128,540 was taken to offset the current royalty receivable. *While the Company believes it has fulfilled its obligation under the contract, the Company will work with CC-E to resolve the issues that have arisen relating to the licensee agreement*.

(Emphasis Added.)

116.   In fact, *in February 2004, a year and a half after such disclosure*, an

inspection of the Cryo-Cell Europe site and equipment was conducted by Geoffrey J.

O'Neil, Ph.D., President of Regenetech, Inc.  In his report, O'Neil stated, in pertinent

part:

### 1. BACKGROUND:

From a discussion with Dr. Marc Waeterschoot, the unit was delivered
from the U.S.A. in 2001 and installation was performed and completed
around the latter part of November, 2001.  Dr. Waeterschoot indicated
prior to the inspection that this cryo preservation unit had never "worked",
was unreliable and posed severe risk to the long-term storage of
irreplaceable cord blood stem cell samples.

### 2. PRELIMINARY INSPECTION OF THE LIQUID NITROGEN CELLULAR STORAGE UNIT (CCEL-II):

The liquid nitrogen storage unit that was delivered from Cryo-Cell Inc.,
U.S.A. was present on the laboratory at Cryo-Save, Belgium.  This unit
resembled the CCEL-II unit at Cryo-Cell Inc. but *unlike the unit in
Clearwater no identification label was visible that would indicate that
this instrument was in fact a CCEL-II unit*.  The outside appearance of
the unit was good, with no visible marks or dents on the outer casing.  The
unit was **not** connected to electrical power supply or a liquid nitrogen
source.  Furthermore the unit was **not** connected to a computer system[.]
Electrical power, liquid nitrogen source and a computer system is (sic)
necessary for the operation of this instrument.  *This unit differed
outwardly in appearance from a similar instrument located at Cryo-
Cell Inc., Clearwater, in that no temperature/liquid nitrogen level
gauges (with manual fill buttons) were visible anywhere on the
surface of the instrument (the CCEL-II unit at Cryo-Cell Inc. has 2
such indicators, one for each of the 2 tanks).*

On closer inspection of the instrument *it was apparent that there was no
label affixed to the instrument housing that provided vital
information on its manufacture including such vital information as
serial number, model, model number, date of manufacture,
manufacturer and any warning labels*.  In addition, *there was no label
indicating that this instrument had been CE marked and at least met
minimal safety and electrical standards*.  In contrast to this, it was
noted by the inspector that all other major instruments in the laboratory
had the above information attached and visible.

*It is extremely important that a manufacturer of medical equipment provide the above information for each instrument that it produces*. In this way, the components used in the manufacture of a specific instrument can be logged and traced and [this] is an essential part of quality assurance procedures. *It would be considered a complete breakdown of quality assurance procedures on the part of any manufacturer not to supply such information on delivery of major laboratory equipment*.

## 3. CCEL-II INSTALLATION DOCUMENTATION:

The inspector requested all documentation pertaining to the installation of this equipment. *No installation documentation could be provided at the time of inspection*. Installation documentation provides information such as date of installation, who installed the equipment and their affiliation and technical qualification, calibration data, whether instrument met (meets) manufacturer's specification. Laboratory quality assurance procedures require that installation data be available. This information certifies that the instrument operates according to manufacturer's specifications. *A most important aspect of the installation process of this equipment would have been the precise calibration of temperature probes within the liquid nitrogen tanks themselves. The installers did not bring equipment with them to ascertain that the temperature probes in the tanks were working appropriately or correctly and thus there is no way of determining that the temperatures within the tanks meet manufacturer's specification*.

*Thus there is no documentation indicating that this instrument was either installed, installed correctly, calibrated or working at any time in 2001 and, therefore, blood samples could not be safely stored without such certification*.

## 4. INCOMPLETE SUPPLY OF INSTRUMENT PARTS FOR CCEL-II OPERATION:

*Dr. Waeterschoot indicated to the inspector that the instrument (so-called CCEL-II) had been delivered to his (sic) without vital parts necessary for its operation*. The CCEL-II is computer driven and **cannot** be operated manually. The instrument, as pointed out earlier, lacks indicators that would provide information as to temperature within the tank, level(s) of liquid nitrogen and an emergency alarm indicator. *The cryopreservation tank requires compressed air for operation of the sample insertion device. No air compressor was built into the instrument*. Dr. Waeterschoot had to purchase a large air compressor when the instrument was installed in order that the CCEL-II could operate. It is unlikely that this compressor met the manufacturer's specification (no

information could be determined as to the manufacturer's specification). No compressor was delivered from the manufacturer and *the use of the current compressor poses a risk to the effective and safe operation of this instrument*. In addition, it was surprising that *no computer was also supplied by the manufacturer*. Dr. Waeterschoot had to supply a laboratory computer for this purpose and was supplied by him at time of installation.   Again it is unclear whether this computer met the specification(s) of the manufacturer.   Operation software was then installed on this computer but no validation procedures were undertaken by the installer to document the safe and reliable operation of the instrument.

**Thus there was a high risk of computer/software failure and a corresponding high risk to the safety and integrity of any stored blood specimens**.

## 5. CCEL-II OPERATOR'S MANUAL:

*No Operator's Manual was supplied by the manufacturer*.  The issue of an Operator's Manual is an integral part of the installation process for any laboratory equipment.  The operator's manual provides step by step instructions for the safe operation of laboratory instrumentation as well as information on preventive maintenance procedures, emergency procedures and customer support.  A vital aspect for the safe operation of this machine would be the procedures for the calibration of the temperature probes. Without this routine calibration of temperature, blood samples cannot be stored safely in this instrument[.]  It is important to point out that Operator's Manuals were available for all other major equipment in Dr. Waeterschoot's laboratory.

A critical aspect that should be addressed at this point concerns emergency procedures and how to retrieve samples under catastrophic failure conditions.  This information was nowhere to be found.

*Without the Operator's Manual, the CCEL-II cannot be operated safely or reliably by laboratory personnel*.  It is the opinion of the inspector that samples could not be removed in sufficient time periods under catastrophic failure circumstances to maintain the integrity of the blood specimens*.

## 6. CCEL-II TRAINING DOCUMENTATION:

*No documentation of training of laboratory personnel on the use of the CCEL-II was available* which would have indicated that personnel were trained in all aspects of the operation of the CCEL-II by qualified instructors.

**Laboratory equipment cannot be safely operated in the laboratory unless it has been demonstrated (by documentation) that personnel were trained appropriately**.

## 7.   CLOSE INSPECTION OF LIQUID NITROGEN CELLULAR STORAGE SYSTEM (CCEL-II):

*As indicated throughout this report, the CCEL-II was not operational*. This was due to the fact that:

1.   The CCEL-II did not have an appropriate computer system or software
2.   The CCEL-II lacked a device to supply compressed air for operation of the robotic device

A close inspection of the unit revealed that a camera had been installed to this machine to check visually that samples were inserted into the tank. Dr. Wadeterschoot (sic) indicated that the camera could not work because when the machine was closed up in order to operate, there was no light source.  At time of installation, Dr. Waeterschoot purchased a household light bulb and electrical connection cord to be used as the light source which is an n (sic) unacceptable practice from both a safety and validation standpoint.  *It is clear from the inspection that <u>this unit was nothing more than a prototype unit that had never undergone appropriate testing or validation.</u>*

Cracked insulating materials (see photograph above) were also visible at the top interior of the liquid nitrogen tank.  A similar problem has plagued the CCEL-II in Clearwater. The material was so badly cracked on the instrument in Belgium that it was likely that pieces would break off, fall into the tank and jam the robotic device.  *This demonstrates that the CCEL-II materials used in its manufacture were not tested under the appropriate test conditions such as in the presence of liquid nitrogen*.  Loose electrical wires were also visible and large pieces of plastic had been left on top of the tanks and could interfere with the proper operation of the unit.  It was also apparent that only one side of the CCEL-II was to be operational and it is uncertain why the entire unit was not to be operational.  *The manufacturer must supply relevant information that indicates that all materials that come in contact with liquid nitrogen (liquid or vapor) have been tested for use under these circumstances.  This is particularly important for the tank itself, the circulating pump and other materials*.

Although insertion of cryovials into this unit could not be performed at the inspection, Dr. Waeterschoot pointed out that a multi specimen transfer

block (see photograph below) had been left with the unit.  The purpose of this block is to house several specimens and avoid feeding specimens one at a time for insertion into the storage unit.  *The block, however, <u>did</u> <u>not</u> fit the machine housing and could never be used (see photograph below).  Furthermore no validation procedures bad been performed to show that the block maintained the appropriate temperature during the insertion process.*

The insertion claw of the instrument (pictured below) was also examined.  Since the instrument was not operational it was unclear whether the claw on this machine was similar to that of the unit at Cryo-Cell Inc. U.S.A.  The claw on the instrument at Cryo-Cell had been modified since several cryovials had either been broken or not inserted correctly into the liquid nitrogen tank.

The bar-code reader on the unit could also not be tested but Dr. Waeterschoot indicated that there had been problems with the reader scanning the barcode of vials that had been at low temperatures due to "frosting over" of the bar code.  *This is indeed a major problem of the unit in Clearwater.*  The cryovials continue to spin in front of the reader, are often not inserted and can defrost.

## 8. CCEL-II VALIDATION:

*Prior to laboratory equipment being used routinely in the laboratory, the equipment must be validated.  No validation data was available at the time of inspection that would indicate that this equipment was operational.*  Validation data should include, but is not limited to[,] computer and software validation, tank temperature validation, cryovial insertion validation (including camera device), [and] multi specimen transfer block temperature validation.  A major design flaw of this equipment concerns the inability to validate levels of liquid nitrogen in the storage tanks.  It can never be ascertained that the appropriate levels of liquid nitrogen are being maintained.  *Thus it is clear from the lack of validation data that the CCEL-II was not delivered in "working condition[.]"*

## 9. CCEL-II DESIGN FLAW:

In addition to the above design flaw concerning measurement of levels of liquid nitrogen in the tank itself, the CCEL-II suffers from a **critical (and perhaps fatal) design flaw** that renders the unit unsafe for long term storage of precious medical materials in liquid nitrogen.  Because the tanks are so tall, the temperature at higher levels within each tank cannot be maintained at -196 degrees Celsius.  To overcome this, a pump was introduced that circulates liquid nitrogen to the top of the tank and

apparently maintains appropriate temperatures at higher levels although no validation data is available.  If this pump ever malfunctions, then the temperature at higher levels in the tank increases quickly and blood specimens may be compromised irreversibly.   Furthermore, samples cannot be removed quickly from the unit.  Thus the CCEL-II relies solely on this pump for safe operation.  If the pump fails, there is no redundant system that would maintain the integrity of blood specimens and, furthermore, no local distributor/agent to either supply or replace the pump in sufficient time such that specimens are not compromised.  In addition, it is uncertain whether this pump has been validated for use with liquid nitrogen.

## 10. SUMMARY:

*The CCEL-II at Cryo-Safe, Mechelen, Belgium was found on inspection to be non-operational. The instrument was never installed appropriately and was not accompanied by the necessary components for its operation, including validated computer/software and compressed air capability.*  It was indicated by Dr. Waterschoot (sic) that the software never functioned correctly but this could not be tested by the inspector.  The equipment also lacked a multi specimen insertion device (validated and tested) that would fit the machine.  The instrument also had a prototype camera device attached that was non functional and untested.  The inner housing of the storage unit was badly cracked indicating that materials were used in the construction of the unit were not validated for use at low temperatures.  Most importantly the unit itself has a design flaw as mentioned above that questions its reliability and use as a long term cryostorage unit. *This equipment, therefore, was not operational at any time period in the laboratory in Belgium, was not validated and remains nothing more than a prototype instrument. To demonstrate that the unit "works", all elements as outlined in this report must be met.*  Without the appropriate information on the GMP (Good Manufacturing Practices) involved in the production of this machine combined with the facts outlined in this report, *it would be considered medically unethical to store samples of cord blood in this instrument at this time.*  Design control data procured during the development period of this instrument will reveal what work has been done to assure the reliability and safety of this instrument,

(Emphasis Added.)

117.   Defendants had the responsibility to select generally accepted accounting principles that were appropriate to reflect Cryo-Cell's business activities.  Defendants also had the responsibility to design, implement, and maintain a system of internal

accounting controls that would provide accounting records to appropriately reflect the transactions of Cryo-Cell.

118.   In fact, Section 13 of the Exchange Act of 1934 requires:

Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -

A.   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

i.   transactions are executed in accordance with management's general or specific authorization;

ii.   transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii.   access to assets is permitted only in accordance with management's general or specific authorization; and

iv.   the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

119.   Notwithstanding these regulations, Defendants engaged in egregious violations of GAAP resulting in the material overstatement of Cryo-Cell's operating performance during the Class Period.   Indeed, the magnitude and egregiousness of the Company's improper accounting during the Class Period is evidenced by E&Y's resignation as the Company's independent auditors after being engaged only *two* months and without having conducted a financial statement audit or review.

120.   In addition to the accounting improprieties stated above, Cryo-Cell presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

a.  The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

b.  The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

c.  The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

d.  The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect

- 55 -

investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

e. The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

f. The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

g. The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

121.   The Company's Class Period Forms 10-KSB and 10-QSB filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-B.

### 8.   False and misleading internal and disclosure control statements and management certifications

122.   Moreover, following the catastrophic accounting scandals in recent years, Congress enacted the Sarbanes-Oxley Act, in part, to heighten the responsibility of

public company directors and senior managers associated with the quality of financial

reporting and disclosure made by their companies.  Section 906 of Sarbanes-Oxley, in

pertinent part, provides:

> (a) CERTIFICATION OF PERIODIC FINANCIAL REPORTS - Each periodic report containing financial statements filed by an issuer with the Securities Exchange Commission pursuant to section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.
>
> (b) CONTENT - The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d) and *that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer*.
>
> (c) CRIMINAL PENALTIES - Whoever
>
> (1) certifies any statement as set forth in subsections (a) and (b) of this section knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in this section shall be fined not more than $1,000,000 or imprisoned not more than 10 years, or both; or
>
> (2) willfully certifies any statement as set forth in subsections (a) and (b) of this section knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in this section shall be fined not more than $5,000,000, or imprisoned not more than 20 years, or both.

(Emphasis added.)

123.   In addition, SEC promulgated Items 307 and 308 of Regulation S-B (17.C.F.R.

228.307) which provide that small business issuers like Cryo-Cell generally disclose:

- The conclusions of the small business issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the small business issuer's disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15d-15(e) under the Exchange Act) as of the end of the period covered by the report, based on the evaluation of these controls

and procedures required by paragraph (b) of Rule 13a-15 or Rule 15d-15 under the Exchange Act; and

- A report of management on the small business issuer's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act) that contains:

  - A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the small business issuer;

  - A statement identifying the framework used by management to evaluate the effectiveness of the small business issuer's internal control over financial reporting as required by paragraph (c) of Rule 13a-15 or Rule 15d-15 under the Exchange Act;

  - Management's assessment of the effectiveness of the small business issuer's internal control over financial reporting as of the end of the small business issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective.  This discussion must include disclosure of any material weakness in the small business issuer's internal control over financial reporting identified by management.  Management is not permitted to conclude that the small business issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the small business issuer's internal control over financial reporting; and

  - A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the small business issuer's internal control over financial reporting.

- Any change in the small business issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Rule 13a-15 or Rule 15d-15 under the Exchange Act that occurred during the small business issuer's last fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting.

124.   As a result of the forgoing requirements, Cryo-Cell's fiscal 2002 Form 10-KSB

filed with the SEC on February 28, 2003, disclosed:

> Within 90 days prior to the date of this report, we carried out an evaluation (the "Evaluation"), under the supervision and with the participation of our President and Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the design and operation of our disclosure controls and procedures ("Disclosure Controls"). Based on the Evaluation, our CEO and CFO concluded that, subject to the limitations noted below, our Disclosure Controls are effective in timely alerting them to material information required to be included in our periodic SEC reports.

> We have also evaluated our internal controls for financial reporting, and there have been no significant changes in our internal controls or in other factors that could significantly affect those controls subsequent to the date of their last evaluation.

> Our management, including our CEO and CFO, does not expect that our Disclosure Controls and internal controls will prevent all error and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management or board override of the control.

> The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, control may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

125.   Cryo-Cell's fiscal 2002 Form 10-KSB also contained the following certifications:

CERTIFICATIONS OF PRINCIPAL EXECUTIVE OFFICER

AND PRINCIPAL FINANCIAL OFFICER REQUIRED
PURSUANT TO SECTION 302 OF THE
SARBANES-OXLEY ACT OF 2002

I, John V. Hargiss, certify that:

1.      I have reviewed this annual report on Form 10-KSB of CRYO-CELL International, Inc.;

2.      Based on my knowledge, *this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report*;

3.      Based on my knowledge, *the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report*;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

        a)      *designed such disclosure controls and procedures to ensure that material information* relating to the registrant, including its consolidated subsidiaries, *is made known to us by others* within those entities, particularly during the period in which this annual report is being prepared;

        b)      *evaluated the effectiveness of the registrant's disclosure controls and procedures* as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

        c)      presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

        a)      *all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability*

- 60 -

*to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls*; and

   b)   *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls*; and

6.    The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Dated:  February 28, 2003
By:  /s/   John V. Hargiss
John V. Hargiss, Chief Executive Officer

(Emphasis Added.)

   I, Jill Taymans, certify that:

1.    I have reviewed this annual report on Form 10-KSB of CRYO-CELL International, Inc.;

2.    *Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report*;

3.    Based on my knowledge, *the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report*;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a_14 and 15d_14) for the registrant and we have:

   a)   *designed such disclosure controls and procedures to ensure that material information* relating to the registrant, including its consolidated subsidiaries, *is made known to us by others* within those

entities, particularly during the period in which this annual report is being prepared;

b) *evaluated the effectiveness of the registrant's disclosure controls and procedures* as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a) *all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls*; and

b) *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls*; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

Dated:
February 28, 2003

By: /s/   Jill Taymans
Jill Taymans, Vice President, Finance

(Emphasis Added.)

126. On or about March 31, 2003, Cryo-Cell filed an amendment to its fiscal 2002 Form 10-KSB that repeated the above noted false and misleading internal and disclosure control statements and certifications.

127.   Defendants knowingly or recklessly failed to comply with the requirements of SEC Regulation S-B, the Securities Exchange Act and Sarbanes-Oxley in that:

    a. The Company's reported revenues were materially overstated as the result of the ***direct contravention of Cryo-Cell's publicly stated policy*** of revenue recognition;

    b. The Company ***failed to disclose*** the existence of or the accounting policies associated with its enrollment fee revenue;

    c. The Company ***failed to disclose*** the material contingencies associated with its U-Cord technologies;

    d. The Company ***failed to timely reserve for uncollectible receivables***;

    e. The Company ***failed to correct its improper accounting and financial reporting*** of its marketing rights and royalties ensuing therefrom;

    f. The Company ***failed to correct its improper accounting and financial reporting of enrollment fee revenue*** in accordance with GAAP and SEC rules and regulations;

    g. The Company ***failed to take the necessary steps to accurately record and document the Company's transactions***, and as a result of its failure to correct such deficiencies, Defendants were able to override and manipulate the controls that existed;

    h. ***The SEC issued numerous statements*** to its registrants, their auditors and to accounting and auditing standards-setters ***warning*** them to be ever vigilant ***about the fairness of financial reporting practices in general***

- 63 -

*and revenue recognition practices in particular* after having witnessed alarming financial reporting abuses *during the Class Period*;

i.   **E&Y resigned as Cryo-Cell's auditor after only <u>TWO</u> months having learning information that called into question "the fairness and reliability of the financial statements previously issued [by Cryo-Cell] and financial statements <u>to be issued</u> covering subsequent periods" <u>WITHOUT</u> the benefit of conducting an audit or review of the Company's financial statements.**

128.   As a result of the foregoing, Defendants knew, or recklessly ignored, that the Company's internal and disclosure controls and management certifications filed with the SEC were materially false and misleading.

## C.   Cryo-Cell's Technology That Was The Basis Of Its Business Model Did Not Work[12]

129.   Again, Cryo-Cell is in the business of collecting, processing, and cryogenically storing umbilical cord blood stem cells for possible later medical use by the individuals whose cells are stored, or by their closely-related family members. Umbilical cord blood contains a rich supply of stem cells, which have been found to have a variety of medical uses. Expectant mothers receive Cryo-Cell's Collection Kit, and, upon giving birth, a blood sample is retrieved from the umbilical cord and sent to Cryo-Cell's Clearwater, Florida laboratory. The sample is then processed, tested for infectious diseases, the stem cells contained within the sample are separated out from the rest of the material, and the stem cells are cryogenically stored in bar-coded cryovials in a liquid nitrogen-cooled unit at approximately -320 degrees Fahrenheit. Should it ever become

---

[12] Plaintiffs incorporate by reference all preceding paragraphs alleged herein.

necessary, the stem cells can be retrieved from cryostorage and used in certain medical procedures.

130.   It is vital that the stem cell samples collected by Cryo-Cell remain cryogenically preserved until such time as they may be needed.  Should a sample, once processed and frozen, ever be thawed, the viability of the stem cells may be compromised and people relying on the medical usefulness of those cells could die.  Because the sample vials are relatively small, it could take less than one minute for a sample to thaw at ambient air temperatures.

131.  Cryo-Cell's  business  model,  as  touted  by  the  Company  to  investors, shareholders and prospective customers, was based upon being able to provide quality service at the best price.  Cryo-Cell claimed through press releases, SEC filings and promotional materials that it was able to achieve this goal through the use of its patented, multi-faceted cellular storage units ("CCEL-II") controlled by a computer system which robotically inserted sample vials in pre-selected storage areas inside the storage chamber.  The supposed advantage of this CCEL-II unit was that samples could be cryogenically frozen, stored and retrieved, all without exposing previously-stored samples to ambient air temperatures.   Supposedly, in storage units utilized by competitors, previously stored samples are exposed to ambient air temperatures when a new sample is placed in storage or previously stored samples retrieved.

132.   Despite the supposed benefits of the CCEL-II, according to a former Cryo-Cell Laboratory Director (the "Laboratory Director"), who worked for Cryo-Cell from April, 1999 to June 2003, the CCEL-II was a "nonsense machine" and "a danger to put specimens in."  In fact, the Laboratory Director related that no specimens were stored in

the CCEL-II unit when he began working for the Company. Instead, the specimens were stored in the same types of storage units utilized by Cryo-Cell's competitors. The Laboratory Director further related that he was against putting samples in the CCEL-II, and the machine remained empty for approximately two years after the inception of his employment.

133. During the Class Period, visitors to the Cryo-Cell headquarters, according to the Laboratory Director, including visiting investors and shareholders, would be shown the "patented CCEL-II" unit, but were not told that no specimens were being stored inside. When investors began asking about the specimens being stored in the CCEL-II, Defendant D. Richard mandated that samples be stored in the CCEL-II. The Laboratory Director informed Defendant Maass that samples should not be stored in the CCELL-II. However, the Laboratory Director related that Maass was "bullied" by D. Richard to store samples in the CCEL-II and so approximately 1400 samples were transferred to the unit in mid-2001. According to the Laboratory Technician, the Company initiated a program to transfer storage of all samples into the CCEL-II by the end of 2003; approximately 20,000 samples were being stored in the CCEL-II when its use was discontinued.

134. Furthermore, according to the Laboratory Director, the CCEL-II was never validated, meaning it was never tested to show that it was fit for its intended purpose. According to the Laboratory Director, it is standard procedure for laboratories to validate their equipment before using it.

> **1. Defendants' public statements touting the competitive advantage gained through the use of the CCEL-II unit**

135.   On March 9, 1998, Defendant D. Richard was interviewed by the Tampa Bay Business Journal for an article entitled "Blood Storage Concern Bullish." The article stated as follows:

> The robotic storage units, such as the one at the Clearwater headquarters, can accommodate up to 35,000 five-cubic-centimeter vials of material. The stored material can be quickly, automatically, individually removed or stored by computerized robot arms, thus preventing room temperature air entering the chamber and warming the other stored specimens.
>
> **The company says that's a significant improvement over competitors' storage units** – which was the vision [Defendant D.] Richard first had.

(Emphasis added.)

136.   In its Form 10-KSB for the fiscal year ended November 30, 1998, filed on March 16, 1999 and signed by Defendants D. Richard, Maass, Taymans, Modzelewski and Wilhelm, the Company touted its capabilities as follows:

> The Company believes that **its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.
>
> \*      \*      \*
>
> Currently available units from other providers of cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens. **Moreover the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.** CRYO CELL has designed and holds patents on a system which makes use of the latest in computer, robotics, and bar code laser scanning identification technology.

(Emphasis added.)

137.   The Company's Form 10-QSB for the quarter-ended February 28, 1999 filed with

the SEC on April 14, 1999 and signed by Defendant D. Richard stated:

> The Company's technology involves patented, multi-faceted cellular storage units and the technology for processing stem cells from umbilical cord blood.  **The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.  The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company.**  The Company is the assignee of all patents on the units.

(Emphasis added.)

138.   The Company's Form 10-QSB for the quarter-ended May 31, 1999 filed with the

SEC on July 15, 1999 and signed by Defendant D. Richard stated:

> The Company's technology involves patented, multi-faceted cellular storage units and the technology for processing stem cells from umbilical cord blood.  **The Company believes that its long-term cellular storage unit will provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The unit is controlled by a computer system that robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company.**  The Company is the assignee of all patents on the units.

(Emphasis added.)

139.   The Company's Form 10-QSB for the quarter-ended August 31, 1999 filed with

the SEC on October 14, 1999 and signed by Defendant D. Richard stated:

The Company's technology involves patented, multi-faceted cellular storage units and the technology for processing stem cells from umbilical cord blood. **The Company believes that its long-term cellular storage unit will provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The unit is controlled by a computer system that robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.

(Emphasis added.)

140.   The Company's Form 10-KSB for the fiscal year ended November 20, 1999 filed

on February 28, 2000 with the SEC, and signed by Defendants D. Richard, Maas,

Taymans, Modzelewski and Wilhelm stated:

Given the potential benefits of U-Cord stem cell preservation, the number of stored specimens is still very small relative to the population and the approximately four million births per annum in the United States alone. Outside of lack of awareness, a critical reason for this low level of market penetration is the misperception of the high cost of the procedure and storage versus the relatively low incidence of use. However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplants. A number of competitors in this market have been charging upwards of $1000 - $1500 for this procedure plus a fee for storage. The cost is usually not covered by insurance. The Company's strategy is to make this procedure affordable and within financial reach of most families. **The growth and profitability of the Company will come from increases in specimen volume driven by its marketing approaches, resulting in a base of annual renewal fees.**

\*      \*      \*

The Company believes that its long-term cellular storage units **can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and dual**

- 69 -

**identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.

\*       \*       \*

**Currently available units from other providers of cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens. Moreover the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.** The Company has designed and holds patents on a system which makes use of the latest in computer, robotics, and bar code laser scanning identification technology.

(Emphasis added.)

141.   The Company's Form 10-QSB for the quarter-ended February 29, 2000 filed with

the SEC on April 14, 2000 and signed by Defendant D. Richard stated:

Given the potential benefits of U-Cord stem cell preservation, the number of stored specimens is still very small relative to the population and the approximately four million births per annum in the United States alone. Outside of lack of awareness, a critical reason for this low level of market penetration is the misperception of the high cost of the procedure and storage versus the relatively low incidence of use. However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation. A number of competitors in this market have been charging upwards of $1000 - $1500 for this procedure plus a fee for storage. The cost is usually not covered by insurance. The Company's strategy is to make this procedure affordable and within financial reach of most families. **The growth and profitability of the Company will come from increases in specimen volume driven by its marketing approaches, resulting in an increasing base of annual renewal fees.**

\*       \*       \*

The Company's technology involves patented, multi-faceted cellular storage units and the technology for processing stem cells from umbilical cord blood. **The Company believes that its long-term cellular storage unit will provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis**

- 70 -

> **without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company.**   The Company is the assignee of all patents on the units.

(Emphasis added.)

142.   The Company's Form 10-QSB for the quarter-ended May 31, 2000 filed with the

SEC on July 14, 2000 and signed by Defendant D. Richard stated:

> Given the potential benefits of U-Cord stem cell preservation, the number of stored specimens is still very small relative to the population and the approximately four million births per annum in the United States alone. Outside of lack of awareness, a critical reason for this low level of market penetration is the misperception of the high cost of the procedure and storage versus the relatively low incidence of use.   However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation.   A number of competitors in this market have been charging upwards of $1000 - $1500 for this procedure plus a fee for storage.   The cost is usually not covered by insurance.   The Company's strategy is to make this procedure affordable and within financial reach of most families.   **The growth and profitability of the Company will come from increases in specimen volume driven by its marketing approaches, resulting in an increasing base of annual renewal fees.**
>
>                \*      \*      \*
>
> The Company's technology involves patented, multi-faceted cellular storage units and the technology for processing stem cells from umbilical cord blood.   **The Company believes that its long-term cellular storage unit will provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**   The unit is controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.   **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company.**   The Company is the assignee of all patents on the units.

(Emphasis added.)

- 71 -

143.   The Company's Form 10-QSB for the quarter-ended August 31, 2000 filed with

the SEC on October 13, 2000 and signed by Defendant D. Richard stated:

> The Company's technology involves patented, multi-faceted cellular storage units and the technology for processing stem cells from umbilical cord blood. **The Company believes that its long-term cellular storage unit will provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media**. The unit is controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and dual identification system for inventory control is a competitive advantage for the Company**. The Company is the assignee of all patents on the units.

(Emphasis added.)

144.   The Company's Form 10-KSB for the fiscal year ended November 30, 2000 filed

with the SEC on March 5, 2001 and signed by Defendants D. Richard, Maass,

Taymans, Modzelewski, Wilhelm, Walton and R. Richard stated:

> Given the potential benefits of U-Cord stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone. Critical reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs. However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation and/or other types of treatments. A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges. The cost is usually not covered by insurance. The Company has made this procedure affordable and within financial reach of most families. **The growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

*      *      *

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.

Other cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens. **Moreover the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.** The Company has designed and holds patents on a system which makes use of the latest in computer, robotics, and bar code laser scanning identification technologies.

(Emphasis added.)

145.   The Company's Form 10-QSB for the quarter-ended February 28, 2001 filed with

the SEC on April 13, 2001 and signed by Defendant D. Richard stated:

Given the potential benefits of U-Cord stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone.  Critical reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs.  However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation and/or other types of treatments.  A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges.  The cost is usually not covered by insurance.  The Company has made this procedure affordable and within financial reach of most families.  **The growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

\*        \*        \*

- 73 -

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.**  The Company is the assignee of all patents on the units.

Other cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens.  **Moreover the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.**  The Company has designed and holds patents on a system which makes use of the latest in computer, robotics, and bar code laser scanning identification technologies.

(Emphasis added.)

146.   The Company's Form 10-QSB for the quarter-ended May 31, 2001 filed with the

SEC on July 13, 2001 and signed by Defendant D. Richard stated:

Given the potential benefits of U-Cord stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone.  Critical reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs.  However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation and/or other types of treatments.  A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges.  The cost is usually not covered by insurance.  The Company has made this procedure affordable and within financial reach of most families.  **The growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

\*       \*       \*

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.**  The Company is the assignee of all patents on the units.

Other cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens.  **Moreover, the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.**  The Company has designed and holds patents on a system, which makes use of the latest in computer, robotics and bar code laser scanning identification technologies.

(Emphasis added.)

147.   The Company's Form 10-QSB for the quarter-ended August 31, 2001 filed with

the SEC on October 12, 2001 and signed by Defendant D. Richard stated:

Given the potential benefits of U-Cord stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone.  Critical reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs.  However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation and/or other types of treatments.  A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges.  The cost is usually not covered by insurance.  The Company has made this procedure affordable and within financial reach of most families.  **The growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

*     *     *

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.

Other cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens. **Moreover, the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.** The Company has designed and holds patents on a system, which makes use of the latest in computer, robotics and bar code laser scanning identification technologies.

(Emphasis added.)

148.    The Company's Form 10-KSB for the fiscal year ended November 20, 2001 filed

with the SEC on March 15, 2002 and signed by Defendants D. Richard, Hargiss,

Maass, Taymans, Modzelewski, Wilhelm, Nyberg, Walton and R. Richard stated:

Given the potential benefits of U-Cord stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone. Critical reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs. However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation and/or other types of treatments. A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges. The cost is usually not covered by insurance. The Company has made this procedure affordable and within financial reach of most families. **The growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

*        *        *

- 76 -

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.**  The Company is the assignee of all patents on the units.

Other cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens.  **Moreover, the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.**  The Company has designed and holds patents on a system which makes use of the latest in computer, robotics and bar code laser scanning identification technologies.

(Emphasis added.)

149.   The Company's Form 10-QSB for the quarter ended February 28, 2002 filed with

the SEC on April 12, 2002 and signed by Defendant D. Richard stated:

Given the potential benefits of U-Cord stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone.  Critical reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs.   However, evolving medical technology could significantly increase the utilization of the U-Cord blood for transplantation and/or other types of treatments.  A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges.  The cost is usually not covered by insurance.  The Company has made this procedure affordable and within financial reach of most families.  **The growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

\*          \*          \*

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.**  The Company is the assignee of all patents on the units.

Other cryopreservation systems are manually operated and can expose the laboratory technician to liquid nitrogen when inserting or retrieving specimens.  **Moreover, the use of these units exposes the remaining stored specimens to ambient temperature whenever specimens are inserted or retrieved.**  The Company has designed and holds patents on a system, which makes use of the latest in computer, robotics and bar code laser scanning identification technologies.

(Emphasis added.)

150.   The Form 10-QSB for the quarter ended May 31, 2002 filed with the SEC on July

19, 2002 and signed by Defendant Hargiss stated:

**The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.

(Emphasis added.)

151.   The Form 10-QSB for the quarter ended August 31, 2002 filed with the SEC on

October 21, 2002 and signed by Defendants Hargiss and Taymans stated:

During the period since its inception, the Company's research and development activities have principally involved the design and

development of its cellular storage systems ("CCEL Cellular Storage System") and in securing patents on same. **The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.** The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber. **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature. The efficient use of storage space and a dual identification system for inventory control is a competitive advantage for the Company.** The Company is the assignee of all patents on the units.

152.  The statements made by Defendants in paragraphs 135-151 were false and misleading because they did not disclose the following material facts:

- the Company's storage unit (the "CCEL-II") was not operational and experienced frequent malfunctions such that stem cell samples could not be safely stored, and indeed were not stored in the CCEL-II;

- the vast majority of the Company's samples were stored in the same commercially-available freezers utilized by competitors;

- The use of the commercially-available freezers exposed the Company's samples to ambient air temperatures upon insertion or retrieval of a sample;

- Because the Company was using the same freezers as competitors, the Company could not claim an improved ability to store cells;

- Because the Company was marketing itself as having a competitive advantage through the use of the CCEL-II, the Company could not claim that it would experience growth and profitability knowing that this marketing approach was based on false and/or misleading information.

As such, it was misleading for the Company and Defendants to tout the competitive advantages, safety, and beneficial characteristics of the CCEL-II unit to investors and potential customers when, in fact, the Company and Defendants knew that the CCEL-II did not work properly, if at all, and that customer samples were being stored in the same type of equipment utilized by competitors.

**2.     The problems with the CCEL-II unit are exposed.**

153.    Cryo-Cell's representations of the capabilities and effectiveness of its CCEL-II

were called into question on February 3, 2003, when the *St. Petersburg Times*

published an article entitled "Meltdown" in which serious problems with Cryo-Cell's

CCEL-II machine were exposed.  The article stated, in part::

> CLEARWATER − [Defendant] Wanda Dearth remembers the weekend
> when Cryo-Cell International Inc.'s freezer, which stored more than 1,000
> of its customers' umbilical cord stem cells, had one of its more spectacular
> breakdowns.
>
> The freezer's shutoff valve failed, allowing icy liquid nitrogen to bubble to
> the top of the 7-foot-tall stainless steel storage tank and overflow into the
> blood processing lab.
>
> Dearth, then president of the Clearwater Company, and another employee
> say floor tiles near the freezer cracked from the blast of liquid nitrogen.
> The liquid, which stays at a constant temperature of minus 196 degrees
> Celsius (or minus 320.8 degrees Fahrenheit), created sheets of ice
> everywhere. It encased the freezer. Cleanup crews slid across the floor.
> Inside the freezer, the nonstop flow lifted customers' vials from their
> assigned slots and set them afloat like ice cubes in a drink.
>
> "We had no choice but let the temperature in the freezer rise and then
> retrieve the vials," Dearth said of the fall 2001 incident. "Everyone was in a
> panic."
>
> During the cleanup effort, at least a couple of vials dropped to the bottom
> of the unit and ended up wedged under shelving, Dearth and her coworker
> said. The vials reportedly were not retrieved until several months later
> when the freezer was drained.
>
> Customers, who pay Cryo-Cell $90 a year for safe storage of their
> children's stem cells, were not notified about the incident, Dearth said.
>
> One scientist experienced in cell preservation said it would have been
> difficult to clean up such a mess without compromising the viability of the
> samples. But Cryo-Cell faced a dilemma: Specimens can't be tested for
> damage without thawing them, eliminating the possibility of their future
> use.
>
> Dearth, 50, who left the company soon after the freezer catastrophe for
> unrelated reasons, is not alone in criticizing Cryo-Cell's proprietary freezer.
> **Several current and former employees, as well as the chief executive**

**of Cryo-Cell's European affiliate, say the machine was an unmitigated disaster, constantly malfunctioning and potentially jeopardizing the viability of any stem cells inside.**

**"Customers could be paying for storage of totally useless cells," Dearth said. "But they'll probably never know."**

\*       \*       \*

Cryo-Cell, which was founded in Arizona in 1989 and relocated to Clearwater in 1997, got off to a slow start. It didn't attract its first paying customers until 1998 and by the end of 1999 had fewer than 3,000 samples stored.

From the beginning, Cryo-Cell promoted itself -- to everyone from Lamaze classes to local obstetricians -- as the lowest-price alternative with superior freezer technology. **In every marketing pitch and corporate filing, Cryo-Cell boasted that it had a "competitive advantage" with its patented "computer-controlled, robotically operated, multifaceted cellular storage system" known as the CCEL II.**

**One of the inventors of the CCEL II was [Defendant] Daniel D. Richard, Cryo-Cell's co-founder, a company director and its largest shareholder.**

The way stem cells are processed and stored is critical. One mistake along the way and the specimen could be destroyed, but still appear intact.

After cord blood is received at a storage bank, the stem cells are processed out, then gradually cooled to minus 95 degrees Celsius in a controlled rate freezer. Next they are placed temporarily in a liquid nitrogen canister until they reach minus 196 degrees C. The vials are then transferred to a long-term storage freezer where they are kept in liquid nitrogen or its vapor at 196 degrees below zero C.

While cells can be stored in this manner indefinitely, if the temperature of the samples is allowed to rise above minus 130 degrees C, even briefly, irreparable damage can occur.

**That's one reason Cryo-Cell says its technology is better. To add or retrieve samples from standard lab freezers used by most companies, technicians have to open the lid on top of the unit, exposing all stored samples to room temperature, however briefly.**

The CCEL II machine has a robotic arm that is designed to take a sample fed through a small opening and automatically place it in an assigned slot

in the machine. In the event the specimen ever needs to be retrieved, the robotic arm locates and removes it without exposing stored samples to outside air.

**But as with any new technology, there were problems with the CCEL II. Its gripper arm dropped vials on the lab floor, shattering them. The robotic arm inside the freezer jammed. Pipes froze. Pumps stopped working.**
In 1996, as the company was feverishly trying to turn its marquee technology into reality, Bill Hardy, Cryo-Cell's president at the time, hired Bob Vago to help. Hardy and Vago, who holds a dozen patents, had both worked for Arjo International, a medical equipment company.

Vago, formerly vice president of research and development at Arjo, said he was brought on to ensure CCEL II, which was in the developmental phase, met FDA standards as a medical device. **But he soon convinced Hardy and Richard of the need for an entirely new design, the CCEL III.**

**Much of Vago's time, however, was consumed fixing problems with the earlier model. Vago said he witnessed several CCEL II malfunctions that he characterized as "catastrophic failures," including a liquid nitrogen overflow like the one Dearth experienced more than a year later.**

Vago might have been forewarned. He said his first encounter with the CCEL II was when he visited Illinois Masonic Medical Center in Chicago, which supposedly was using the freezer.

"I immediately received a blistering attack by the top scientist there who said he wasn't about to use the machine," Vago said. "The doctor said it used 10 times the amount of liquid nitrogen it was supposed to, it dropped vials and the pump seized up."

(The genetics group that was using the CCEL II in Chicago has since left the hospital, according to a hospital spokeswoman.)

**Vago said it was normal for the CCEL II's pump to fail every three weeks or so.** When that happened, the flow of liquid nitrogen to the tank's reservoir was interrupted and the temperature inside the freezer gradually rose as the nitrogen vapor warmed. The storage shelf at the top of tank warmed up the fastest; the one at the bottom, closest to the liquid nitrogen reservoir, stayed cold longer.

The crisis occurred so frequently that Vago calculated the freezer's maximum capacity based on a worst-case scenario. If the company stored

- 82 -

specimens only on the bottom seven of the tank's 11 shelves, Vago estimated he had 10 to 12 hours to repair the pump before the temperature hit the critical point of minus 130 degrees C at the seventh shelf.

He said, to his knowledge, only one specimen, belonging to a relative of Dan Richard, then Cryo-Cell's chief executive, was housed in the tank during this period. **But Vago said Richard relentlessly pressed the lab staff to move customer vials into his problem-plagued invention.**

"I told them a reasonable shelf to put vials on," Vago said. "Anything higher than that, there was no way they could save the samples if the pump failed and wasn't repaired in a given time."

\*      \*      \*

In 1998, two years into Vago's tenure at Cryo-Cell, the company was prodded by a major shareholder to bring in outside scientists to evaluate its technology. One of those consultants was Stanley Leibo, a professor of biological sciences at the University of New Orleans and faculty member with the Audubon Center for Research of Endangered Species in that city.

Though Leibo remembers being generally impressed with Cryo-Cell's operation, his report raised several concerns, including the one Vago had raised about the samples thawing during transfer.

\*      \*      \*

**In their 1998 report, Leibo and his associate had sufficient concern about problems with the CCEL II to urge the company to move quickly with the improved design being developed by Vago.**

"Because the CCEL III instrument seems to offer very significant advantages and improvements compared to the CCEL II, we recommend that the company move as quickly as possible to complete the manufacture and installation of the new instrument," the report concluded.

\* \* \*

**When Wanda Dearth joined Cryo-Cell as president nearly two years after Leibo's visit, the company still was relying on the trouble-prone CCEL II freezer.** Dearth, who had been a vice president in charge of nurse staffing at Kforce Inc. in Tampa, said she was a believer in Cryo-Cell's service.

"I agree the chance of needing stem cells is minimal," said Dearth, who is single and has no children. "But I would collect a child's stem cells if I could."

It was not long after being hired in June 2000, however, that Dearth discovered all was not as it seemed at Cryo-Cell. Most importantly, she learned that despite the company's promotion of the CCEL II as its competitive edge, most samples were stored in the same kind of medical freezers used by every other company.

"I was shocked because the CCEL II was the basis of our whole marketing," Dearth said. "We'd have these open houses for expectant parents and we'd even show off the machine. But there were only about 1,000 vials in there."

Dearth soon discovered why the CCEL II had only limited use: It malfunctioned frequently. Nor did the problems abate when a second, supposedly upgraded model was introduced.

"We had problems with that machine from the time it was plugged in," Dearth said. "At one point a girl in the lab passed out, it was leaking so much gas. But when the temperature started rising in the tank, that was more of a crisis than anything."

When the sensor inside the freezer registered a temperature change, it triggered a automatic telephone page to Dearth and Vago, Cryo-Cell's vice president of product development. Dearth said Vago, who lived in nearby Palm Harbor, sometimes would have to climb inside the nearly ceiling-high freezer to clean a fan or repair a pump.

"What concerned me most was that if Bob were hit by a truck, no one else would know what to do," Dearth said. "His backup was in Boston and he wasn't always able to get here at a moment's notice."

But just four months into Dearth's tenure, Vago decided he'd had enough.

Richard had pulled the funding on the development of the CCEL III and announced he had signed a deal to send a CCEL II to Europe. Vago resigned in protest.

"I can't compromise my professional standing and go ahead and do something with a device that I don't believe will ever work," he said. "It was a fundamentally flawed device in my opinion."

Marc Waeterschoot would have to agree. Waeterschoot is the clinical pathologist who has been trying to make the CCEL II freezer work in Europe.

Richard signed the agreement to license the freezer technology to Cryo-Cell Europe in April 2000. The Europeans paid $1.4-million cash to use the Cryo-Cell name and agreed to give the U.S. company 10.5 percent of each processing fee and 20 percent of storage fees. Cryo-Cell, in return, promised to deliver a CCEL II freezer, Waeterschoot said, "as soon as reasonably possible."

Waeterschoot said the European company, which is 6 percent owned by Cryo-Cell International, did not receive the CCEL II until June 2001, 14 months after the contract was signed. When it arrived, it was not functioning, he said.

"It was sitting here until December (2001) not working, then they fixed it, but not properly," Waeterschoot said. "Workers came again in March (2002) and nearly finished, but not really. We're promised that in the near future it will be operational, which I doubt."

Waeterschoot, chief executive of the European company, said **he has never stored any of his company's 6,000 customers' samples in the CCEL II. "I don't dare do that," he said. "I take my client's interest to heart."**

In its October financial filing, Cryo-Cell said its European affiliate was in default of the license agreement and owed the company more than $350,000 in fees. Waeterschoot, who has been running clinical labs for 27 years, doesn't dispute that figure.

**"We paid for something that doesn't work," he said.** "We probably will answer them in court."

\*       \*       \*

(Emphasis added.)

154.   Following the exposure of the CCEL II as a technological failure, Cryo-Cell's

stock closed at a fifty-two week low of $1.00 per share, down $0.36, or more than 26%

in one day, on trading seven times the normal daily volume.

> **3.   Defendants try to mitigate the damage done by the February 3, 2003 St. Petersburg Times article by making additional false and misleading statements.**

155.   The Company wasted no time in responding to the newspaper's exposé. Later in

the day, on February 3, 2003, in response to the *St. Petersburg Times* article of the

same day, the Company issued a press release entitled "Cryo-Cell Confirms Stored Stem Cells Remain Safe and Secure." In this press release, Defendant Hargiss stated "Our first concern is to reassure our clients that **their stem cells are stored in a well-secured and controlled environment and are not subject to compromise. The cells, and the technologies that house them, are fully functional and monitored continually to assure appropriate temperature levels."** (Emphasis added.) Defendant Hargiss further stated "We will continue to develop and enhance our cryopreservation technologies to ensure the safe storage and effective use of umbilical cord blood stem cells for our over 46,000 clients and for our future clients."

156. A follow-up article entitled "Cryo-Cell Works to Calm Parents as Stock Falls" was published in the *St. Petersburg Times* the next day on February 4, 2003. In this article, Defendant Hargiss was quoted as saying **"We will be happy to assure parents that their child's specimens are safe and have been safe in the CCEL II .... The CCEL II has been operational since its inception."** (Emphasis added.) The February 4, 2003 article further revealed:

> Bill Hardy, who was chief executive of the company from 1996 to 1997, said Monday the CCEL II never worked properly during his tenure.
>
> **"Sure it was operational," Hardy said. "You could turn it on and the red light would go on. But it was never reliable. I never allowed any specimens to be put in it because I didn't trust it."**
>
> **Instead, he said, stem cells were kept in conventional laboratory freezers.**
>
> Hardy said he hired Bob Vago, a research engineer, to modify the CCEL II.
>
> "I can't tell you the time he and I spent together trying to get the thing fixed," Hardy said of Cryo-Cell's custom-designed freezer. **"Early on we**

> **came to the decision that we would have to build a new machine, but
> we kept running into roadblock after roadblock."**

(Emphasis added.)

157.   On February 6, 2003, in response to the *St. Petersburg Times* articles,

Defendant Hargiss sent a letter to the editor, and posted same on the Cryo-Cell

website.  The letter stated as follows:

> First and foremost, all client cord blood specimens, whether stored in a
> conventional cryogenic storage vessel (dewar unit) or in CRYO-CELL's
> proprietary storage system, the CCEL II, have been maintained within an
> acceptable cryogenic temperature range.  Allegations to the contrary, in
> some cases made by former, possibly disgruntled employees, are
> inaccurate and misleading.

158.   The statements by Defendant Hargiss in the letter to the *St. Petersburg Times* as

set forth in paragraphs 155-157 above were false and misleading because they falsely

represented that samples were stored in a well-secured and controlled environment,

and they had been maintained within an acceptable temperature range when, in fact,

due to the frequent malfunctions of the CCEL-II, no guarantee could be made as to

whether the samples had been properly preserved.   Additionally, the statement in

paragraph 155 was false and misleading because the CCEL-II was not fully functional

and was subject to compromise and frequent failures.

159.   Soon after the *St. Petersburg Times* exposé, in an article entitled "Cryo Cell

Reports Daunting Losses" on March 1, 2003, the *St. Petersburg Times* wrote:

> [Defendant] Dearth and other former and current employees, meanwhile,
> have alleged that the proprietary freezer Cryo-Cell uses at its Clearwater
> storage facility, the CCEL II, routinely malfunctioned, endangering the
> viability of customers' stem cells.  The chief executive of Cryo-Cell's
> European affiliate, which has refused to pay the company $324,000 in
> royalties, also said a CCEL II shipped to Europe has never worked.
>
> **Cryo-Cell has denied all allegations of freezer problems and said all
> customer samples are "safe and secure."**

(Emphasis added.)

160.    The Company's Form 10-KSB filed with the SEC on February 28, 2003 and amended on June 27, 2003, and signed by Defendants Hargiss, Taymans, Modzelewski, Wilhelm, Nyberg and Walton and certified by Hargiss and Taymans (the "February 28, 2003 10-KSB") stated:

> Given the potential benefits of U-Cord™ stem cell preservation, the number of parents of newborns participating in stem cell preservation is still relatively small compared to the number of births (four million per annum) in the United States alone.  Some reasons for this low level of market penetration are the misperception of the high cost of stem cell storage as well as a general lack of awareness of the benefits of stem cell preservation programs.  However, evolving medical technology could significantly increase the utilization of the U-Cord™ blood for transplantation and/or other types of treatments.  A number of competitors in this market have been charging upwards of $1000 - $1500 for this stem cell preservation plus higher annual fees for storage than the Company charges.  The cost is usually not covered by insurance.  The Company has made this procedure affordable and within financial reach of most families.  **The Company anticipates the growth and profitability of the Company should come from increases in stem cell specimen storage volume driven by its marketing approaches, resulting in an increasing base of annual stem cell storage renewal fees.**

> \*       \*       \*

> **The Company believes that its long-term cellular storage units can provide an improved ability to store cells or other material in liquid nitrogen, its vapors or other media.**  The units are controlled by a computer system, which robotically inserts vials in pre-selected storage areas inside the chamber.  **Additionally, the stored material can be robotically inserted or retrieved by computer on an individual basis without all of the remaining specimens being exposed to ambient temperature.   The Company believes its efficient use of storage space and a dual identification system for inventory control is a competitive advantage.**

> The Company has designed and holds patents on its system, which makes use of the latest in computer, robotics and bar code scanning identification technologies.   The unit is assembled by a contract manufacturer utilizing the Company's patented designs.  **The final assembly of the unit, rendering the unit suitable for its intended**

**medical purpose, is done at the Company's headquarters in Clearwater, FL.** The Company has deployed its CCEL II system for use and has abandoned design and development of the CCEL III system.

161. The statements made by Defendants in paragraph 160 were false and misleading for the same reasons described above in paragraph 150 and because the CCEL-II unit was never suitable for its intended purpose.

162. Additionally, in its February 28, 2003 10-KSB, the Company made the following statements:

> The Company currently preserves approximately 50,000 cord blood stem cell specimens for the exclusive use of those families who have elected to store them with CRYO-CELL. The Company believes it is currently the world's largest private cord blood stem cell bank in terms of the number of stem cell specimens preserved. The Company utilizes a strategy of offering a quality U-Cord™ service at a competitive price. **The Company provides several other key competitive advantages; a safe, secure and monitored storage environment, the extra protection of dual-storage, demonstrated success in the transplant of processed specimens, 7 day per week processing capability, and a 24 hour, 7 day per week clinical support staff to assist clients.**

> \*       \*       \*

> ...In October 2002, the Company began to offer dual storage of each client's specimen at a facility located in Sedona, Arizona. **The specimens are stored in both the Company's proprietary cellular storage system ("CCEL II") and commercially available cryogenic storage equipment.**

> \*       \*       \*

> **A failure in the performance of our cryopreservation storage facility or systems could harm our business and reputation.**

> **To the extent our cryopreservation storage service is disrupted, discontinued or the performance is impaired, our business and operations could be adversely affected....  Our systems and operations are vulnerable to damage or interruption from fire, flood, equipment failure, break-ins, tornadoes and similar events for which we do not have redundant systems or a formal disaster recovery plan** and may not carry sufficient business interruption insurance to compensate us for loses that may occur.

(Emphasis added.)

163.   The statements made in paragraph 161 were false and misleading for the same reasons as described in paragraph 150 and because the Company was using the same freezers as those used by its competitors, and therefore the Company had no competitive advantage, and because few specimens were actually stored in the CCEL-II.

164.   Additionally, the belated risk disclosure in paragraph 161 was false and misleading because Defendants knew that the CCEL-II was failing to perform and that there had been numerous malfunctions.   Such warning statement was misleading because the events which the Company cautioned might occur had in fact already occurred.

165.   On March 3, 2003, the Company issued a press release entitled "Cryo-Cell International, Inc. Releases Fourth Quarter and Year End Results" in which Defendant Hargiss again attempted to mitigate the damage caused by the *St. Petersburg Times* articles.

> "…Because of this record volume we are now storing approximately 50,000 cord blood specimens in CRYO-CELL's **safe and well-controlled cryogenic environment**.  In addition, to providing a growing recurring revenue base, we gain certain economies by processing a large volume of specimens, which can serve to enhance our gross margins.  We believe this makes CRYO-CELL International the world's largest provider of umbilical cord blood preservation services."

(Emphasis added.)

166.   The Company continued the trend of trying to salvage its reputation by maintaining confidence in its CCEL-II as illustrated in an April 17, 2003, press release entitled "Cryo-Cell Processes 50,000[th] Cord Blood Specimen."  In this press release, Defendant Walton was quoted as saying:

"We believe that CRYO-CELL's well-established client base, **quality systems** and market leadership provide a sense of confidence and assurance to expectant parents and health care professionals when they evaluate companies for the collection, processing, testing and preservation of their newborn's cord blood."

(emphasis added).   Defendant Mass was also quoted in the press release as saying "CRYO-CELL's growth has been achieved by providing **high quality** and value to its clients." (emphasis added).

167.   The statement made in paragraphs 165 and 166 were false and misleading because the majority of Cryo-Cell's samples were being stored, not in its CCEL-II unit, but in commercially-available freezers utilized by competitors.  Additionally, the CCELL-II unit was known to experience frequent malfunctions, and was, therefore, not safe or well-controlled.

168.   Ultimately, the Company could not sustain the use of its failing CCEL-II system. In its Form 10-KSB filed with the SEC on March 1, 2004, and signed by Defendants Walton, Taymans, and Nyberg (among others) and certified by Defendants Walton and Taymans, the Company disclosed that further utilization of the CCEL system had been terminated, and that samples were being stored in commercially available cryogenic equipment.  The March 1, 2004 10-KSB further stated that "[t]his decision was based on the conclusion that the Company's resources are best utilized for market development and expansion of services."  The decision was made in the fourth quarter of fiscal year 2003 (which, for Cryo-Cell, ended on November 30, 2003), and was approved by the Board in January, 2004.

169.   The statement made by the Company and Defendants in paragraph 168 was false and misleading in that the Company failed to disclose that it discontinued its use of

the CCEL-II machine because it was not operational and was plagued with design flaws, and not because the Company wished to focus on market development.

170.   Despite the fact that the Board had approved the discontinuation of the CCEL-II unit, the Company's supposed edge over its competitors, in January 2004, and had made the decision to discontinue the CCEL-II by at least November 30, 2003, the Company waited until March, 1, 2004 to disclose this fact to investors.

171.   Additionally, despite the Company's representation that the decision to discontinue use of the CCEL-II unit was made in the fourth quarter of 2003, the Company and the Defendants actually knew long before that the CCEL-II was malfunctioning, and was not a safe and secure place to store its clients' stem cell samples.

172.   Sometime in February of 2004, the United States Food and Drug Administration ("FDA") disallowed the use of the CCEL-II unit and required Cryo-Cell to store its samples in the same commercially-available cryofreezers utilized by competitors.

## D.   The Company Fails To Disclose Material Aspects Of Its PharmaStem Litigation

173.   In February 2002, PharmaStem Therapeutics, Inc. ("PharmaStem") filed an action in the United States District Court of Delaware against the Company and other companies involved in cord blood banking, alleging patent infringement.   The matter went to trial, and on October 29, 2003, the jury returned a verdict in favor of PharmaStem in the amount of $7 million.   The portion of this verdict attributable to Cryo-Cell was $957,722.   Furthermore, the jury held that Cryo-Cell's infringement of PharmaStem's patent was willful, thus exposing Cryo-Cell to a potential liability of treble damages.

174.   However, in its Form 8-K filed with the SEC on October 31, 2003 and signed by Defendant Taymans, the Company stated:

> Pharmastem Litigation.  In February 2002, Pharmastem Therapeutics, Inc. filed an action.  On October 29, 2003, the jury in the litigation returned a verdict adverse to the Company and the other three co-Defendants with respect to most of the issues presented.  The Company believes the jury's verdict is inconsistent with the evidence at trial.  The Company intends to seek to have the trial court overturn the verdict, and if necessary, to appeal to the federal Court of Appeals.  The Company believes its position is meritorious and that it will ultimately prevail.

175.   The representations set forth in paragraph 173 made in the Company's October 31, 2003 8-K were false and misleading in that the Defendants did not disclose the amount of the judgment against Cryo-Cell, did not disclose that Cryo-Cell's infringement upon the PharmaStem patent was willful, and did not disclose Cryo-Cell's exposure to treble damages.  The amount of the verdict, $957,722 (not including the potential for treble damages), represented approximately two times the amount of the Company's cash, and 22% of the company's total current assets as of August 31, 2003.

176.   It was not until March 1, 2004, when the Company filed its 10-KSB for the fiscal year ended November 2003 with the SEC, that the Company disclosed the amount of the judgment against the Company, and the fact that PharmaStem had requested "enhanced" damages in the amount of $2.8 million.[13]  The Company still did not disclose the jury finding of willful infringement in the PharmaStem litigation, and has yet to disclose this information to investors.

177.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial

---

[13]        Pursuant to 35 U.S.C. § 284, one who is found to be willfully infringing a valid patent may have damages increased "up to three times the amount found or assessed."   The enhanced damages requested by PharmaStem represent this penalty for willful infringement.

contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Cryo-Cell's business prospects, operations and financial condition. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Cryo-Cell and its business prospects, operations and financial condition, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## E.    Additional Scienter Allegations

178.    During the Class period, the Company signed a licensing agreement with a company that would later become Cryo-Cell Europe ("CCEU").    As part of this agreement, the Company was to provide, and did provide, its CCEL-II unit and storage technology to CCEU.  On October 17, 2002, Marc Waeterschoot, CEO of CCEU, sent a letter to the Cryo-Cell Board of Directors, who, at that time included Walton, Maass, Modzelewski, Wilhelm, Winokur, Nyberg, Hargiss and R. Richard.  The letter stated:

> Until today the machine is not working up to the standards that were agreed upon and that are generally accepted.
>
> **Moreover, today the machine that was shown to us in the [Cryo-Cell, Inc.] lab in Clearwater, is not working either.**  If our information is correct, only 1100 samples are stored in the machine.  Some samples might even been lost!

> **The whole intellectual property of [Cryo-Cell, Inc.] was based on this technology, which proves to be not working, unreliable and for the time being, impossible to validate.**

(Emphasis added.)

179.   Additionally, on November 26, 2002, Marc Waeterschoot sent a letter to Defendant Walton and the Cryo-Cell President and Board of Directors, referring to a November 15, 2002 visit by Walton  The letter disclosed that::

- Walton had acknowledged that the CCEU CCEL-II was not working, after having had two major mechanical updates;

- Walton acknowledged that the CCEL-II in Clearwater contained only 1,100 samples out of a total of 42,000 samples collected;

- Walton acknowledged that the CCEL-II unit in Clearwater had not been used for at least three years.

180.   The design flaws of the CCEL-II which the Defendants had known about for years, were confirmed when, on February 9, 2004, Dr. Geoffrey J. O'Neil, Ph.D. conducted a site visit and investigation of the CCEL-II unit provided to CCEU by the Company.  Dr. O'Neil noted that cracked insulating materials were visible on the top interior of the CCEU liquid nitrogen tank, creating a likelihood that pieces would fall off and jam the robotic device.  **"A similar problem has plagued the CCEL-II in Clearwater,"** Dr. O'Neil noted.  Dr. O'Neil also noted the unit's bar code reader was not able to scan vials that had frosted over due to the low temperatures.  **"This is indeed a major problem of the unit in Clearwater.  The cryovials continue to spin in front of the reader, are often not inserted and can defrost."**

181.   Finally, Dr. O'Neil noted in his report:

> **[T]he CCEL-II suffers from a <u>critical (and perhaps fatal) design flaw</u> that renders the unit unsafe for long term storage of precious medical materials in liquid nitrogen.  Because the tanks are so tall, the temperature at higher levels within each tank cannot be**

**maintained at -196 degrees Celsius.**  To overcome this, a pump was introduced that circulated liquid nitrogen to the top of the tank and apparently maintains appropriate temperatures at higher levels although no validation data is available.  If this pump ever malfunctions, then the temperature at higher levels in the tank increases quickly and blood specimens may be compromised irreversibly.  Furthermore, samples cannot be removed quickly from this unit.  Thus the CCEL-II relies solely on this pump for safe operation.  If the pump fails, there is no redundant system that would maintain the integrity of blood specimens and, furthermore, no local distributor/agent to either supply or replace the pump in sufficient time such that specimens are not compromised. **In addition, it is uncertain whether this pump has been validated for use with liquid nitrogen.**

(Underlined emphasis original, all other emphasis added.)

182.   Furthermore, on April 17, 2003, the Company filed a lawsuit against CCEU in the Circuit Court of the Sixth Judicial District in the state of Florida seeking to recover money damages for unpaid royalty payments due under the license agreement with the Company. On October 17, 2003, CCEU filed its Answer, Affirmative Defenses and Counterclaim to the Company's lawsuit and alleged therein that the Company and Defendant D. Richard had represented that the CCEL-II was a working machine with no problems, was the primary advantage Cryo-Cell had over competitors, and that no other company had a similar machine.  However, according to the lawsuit, and as Defendants had known for years, the CCEL-II machine delivered to CCEU did not work.

183.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information

reflecting the true facts regarding Cryo-Cell, their control over, and/or receipt and/or modification of Cryo-Cell's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cryo-Cell, participated in the fraudulent scheme alleged herein.

184.   Additionally, the Individual Defendants engaged in such a scheme to inflate the price of the Company's common stock in order to enhance the value of the their personal holdings and to protect and enhance their executive positions.

### F.   Defendant WS' Participation In The Fraud

185.   Plaintiffs incorporate by reference all allegations above insofar as they relate to WS' materially false and misleading audit opinions on Cryo-Cell's 1998, 1999, 2000, 2001 and fiscal year-end financial statements as if fully set forth herein.

186.   Cryo-Cell was a significant client of WS and a major source of income for WS' New York office.  Defendant WS served Cryo-Cell in various capacities for many years which provided it with significant fees in the performance of such services.  In fact, *for its fiscal 2001 and 2002 years alone, the fees paid by Cryo-Cell and its majority owned subsidiaries to WS exceeded $440,000.*[14]  Indeed, such fees related, in part, to WS's involvement in rendering important judgments in the preparation of Cryo-Cell's Class Period financial statements.

---

[14]   On February 5, 2001, the SEC issued changes to its auditor independence rules that required SEC registrants to disclose in their proxy statements the amount and types of fees paid to their auditors. Accordingly, the fees paid to WS by Cryo-Cell and its majority owned subsidiaries is available for only the latter part of the Class Period.

187. Cryo-Cell was also a long time client of WS.[15]  As a result of its longstanding relationship with Cryo-Cell, and the nature of the auditing and consulting services rendered to the Company, WS' personnel were regularly present at Cryo-Cell's offices and had continual access to, and knowledge of, Cryo-Cell's internal accounting records, its confidential financial and non-public, business documents and employees.

188.  Given its long standing relationship with Cryo-Cell, its intimate knowledge of Cryo-Cell's financial reporting practices and the nature of the auditing and consulting services rendered to Cryo-Cell, WS knew of, or recklessly disregarded, adverse facts concerning the Company's improper financial reporting (detailed at length above) during the Class Period. Nonetheless, WS knowingly, or recklessly, issued false unqualified audit opinions on the Company's 1998, 1999, 2000, 2001 and 2002 year-end financial statements and WS's unqualified audit opinions thereon.

189.  Indeed, *the degree of WS' wrongful conduct is demonstrated by the issuance of their unqualified audit opinions on Cryo-Cell's fiscal year-end 2000 and 2001 financial statements which improperly recognized millions of dollars in income on the sale of rights to Cryo-Cell's U-Cord technology when such technology was independently assessed as being nothing more than a prototype years later in 2004* (see paragraphs 69-80, above).  In fact, *Cryo-Cell's financial statements for the quarter ended August 31, 2002 disclosed that "the Company received a letter from [COLTEC, Ltd.] stating that the Company had not fulfilled its obligations under the licensing agreement."  Accordingly, WS was on*

---

[15]     Defendant WS is the successor to the accounting practice of Mirsky, Furst and Associates, P.A., which audited Cryo-Cell's financial statements from, at least, 1995 through 1997. Accordingly, WS and/or its predecessors audited Cryo-Cell's financial statements since, at least, fiscal year-end 1995 though 2002.

*constructive notice at least as early as the fall of 2002, if it didn't already know, that Cryo-Cell's recognition of millions of dollars in licensing revenue during the Class Period was improper.* Nonetheless, WS improperly failed to take the steps required by Generally Accepted Auditing Standards ("GAAS") in connection with Cryo-Cell's improper reporting of marketing and licensing fee income or its failure to correct its misstated fiscal 2001 and 2002 year-end financial statements

190.   In addition, WS' wrongful conduct is demonstrated by its issuance of unqualified audit opinions on the Company's financial statements during the Class Period when such financial statements improperly failed to reserve for long, outstanding uncollectible receivables, as noted in detail herein (see paragraphs 97-107, above).   In fact, the AICPA issued an Audit Risk Alert ("ARA") in 1998 as an aid to auditors in conducting audits.   Such ARA highlighted "the existence of longer than usual payment terms" as an indicator of *intentionally* misstated revenues and improper financial reporting.   In fact, WS falsely certified that Cryo-Cell's receivables, *the due date of which was repeatedly extended, remained uncollected for years and not reserved for uncollectiblity,* were fairly stated, when they were not, as WS knew or recklessly disregarded.   Indeed, note 13 to Cryo-Cell's financial statements for the fiscal year ended November 31, 2001, which were certified by WS, and accompanied the Company's Form 10-KSB filed with the SEC on **March 15, 2002,** noted that the original due date on the New Jersey receivable had been extended from May 2000 to April 2001.   It further noted that the receivable had been outstanding since November 1999.

191.   Moreover, WS' wrongful conduct of  issuing unqualified audit opinions on Cryo-Cell's fiscal year-end financial statements during the Class Period is otherwise

evidenced by the fact that **E&Y**, who was retained by Cryo-Cell to serve as the Company's independent auditors on March 11, 2003 after it filed its fiscal year-end 2002 financial statements and WS' unqualified audit opinion thereon with the SEC, *resigned after only two months over concerns it had with "the fairness and reliability of the financial statements previously issued [by Cryo-Cell] and financial statements to be issued covering subsequent periods" prior to even conducting an in depth audit or review of the Company's financial statements!* So E&Y, in two months, was able to identify the egregious accounting malfeasance by WS, which was so severe and pervasive that E&Y was unwilling to risk acting as Cryo-Cell's Auditors.

192. Shortly thereafter, on or about June 27, 2003, Cryo-Cell filed a second amendment to its fiscal 2002 Form 10-KSB which included the Company's materially restated fiscal 2002 and 2001 financial statements with the SEC.[16] In such filing, Cryo-Cell admitted that its financial statements issued during the Class Period were materially false and misleading and that, among other things, it understated its accumulated deficit *from its inception* through November 30, 2002 by *30%* as a result of the improper accounting noted herein.

193. Notwithstanding Cryo-Cell's improper accounting, Defendant WS issued unqualified audit opinions that falsely stated that each of the Company's 1998, 1999, 2000, 2001 and 2002 financial statements were presented in conformity with GAAP when they were not, as alleged herein. In fact, in performing such audits, Defendant

---

[16]     On or about February 28, 2003, Cryo-Cell filed its fiscal 2002 Form 10-KSB with the SEC. Such Form 10-KSB contained Cryo-Cell's financial statements for its fiscal year ended November 30, 2002 and WS' unqualified audit opinion thereon. Shortly thereafter, on or about March 14, 2003, Cryo-Cell filed its first amendment to such Form 10-KSB to, among other things, "correct the auditor's letterhead, the date of the independent auditors report and immaterial items such as typographical errors and rounding issues."

WS was required by GAAS, in AU § 380, to discuss the following matters with Cryo-Cell's Audit Committee:

    a. The selection of and changes in **significant accounting policies** or their application;

    b. **The effect of Cryo-Cell's accounting policies on revenue recognition**;

    c. **WS' judgments about the quality, not just the acceptability, of the Cryo-Cell's accounting principles** as applied in its financial reporting;

    d. **Any disagreements with the Company's management on the application of accounting principles relative to entity specific transactions**;

    e. Any consultations with other accountants about auditing and accounting matters;

    f. Any significant unusual transactions;

    g. Any material financial statement misstatement;

    h. Cryo-Cell's internal control polices and procedures;

    i. Cryo-Cell's management's accounting judgments and estimates; and

    j. Any WS audit adjustments;

194.   Cryo-Cell's 2001and 2002 proxy statement disclosed that its Audit Committee discussed the above matters with WS.  In addition, Cryo-Cell's 2001and 2002 proxy statement disclosed that:

    a. **Its Audit Committee met and held discussions with WS about the matters enumerated in the proceeding paragraph**; and

b. The Audit Committee *discussed* Cryo-Cell's *internal accounting controls and the overall quality of the Company's financial reporting with WS*.

195.   Nonetheless, Cryo-Cell issued materially false and misleading financial statements during the Class Period that WS knowingly, or recklessly falsely certified as being presented in conformity with GAAP.   In fact, at the time Cryo-Cell's Audit Committee discussed the above matters with WS, the Company's Board of Directors had already received letters from the purchasers of the rights to the Company's U-Cord technology citing long-standing and ongoing material deficiencies that rendered such technology virtually useless.   Such letters were giant, glaring "red flags" that required WS to reassess the propriety of the Company's financial reporting, which WS did not do.   Moreover, Cryo-Cell's revenue recognition policy for fees received from Revenue Sharing Agreements (which was stated in its audited financial statements for the years ending 1998-2002) was itself in violation of GAAP.   That policy was that "Revenue is recognized when the Company enters into a Revenue Sharing Agreement and the payment pursuant to the agreement has been satisfactorily assured." (See paragraphs 44-49, 56-58, above).    Pursuant to this policy the company improperly recognized millions of dollars in revenues it had not earned. (See paragraphs 45-46, 60, above).  In a Form 8-K filed with the SEC on May 20, 2003, the Company admitted that this policy and practice (which was discussed with and approved by WS), violated GAAP. (See paragraph 62, above).

196.   In issuing unqualified audit opinions on Cryo-Cell's annual financial statements during the Class Period, WS knew or recklessly disregarded that such financial

statements violated numerous provisions of GAAP and were materially false and misleading and inherently unreliable as set forth above.

197.   ***In fact, Cryo-Cell's financial reporting practices were so egregious, that E&Y resigned as Cryo-Cell's auditor after two months <u>without having even conducted an in depth audit or a review of the Company's financial statements</u>***.

198.   Indeed, the AICPA, which promulgated auditing standards before the Public Companies Accounting Oversight Board was created by Sarbanes-Oxley, issued numerous warnings to auditors during the Class Period about improper and/or aggressive revenue recognition practices.   As a result, the AICPA'S SEC Practice Section's Professional Issues Task Force issued its Practice Alert, *Revenue Recognition Issues*, in 1999 to, among other things,

> a.  summarize GAAP's revenue recognition criteria;
>
> b.  identify circumstances that may signal improper revenue recognition; and
>
> c.  describe procedures that may prove effective in limiting improper revenue recognition.

199.   This alert, and numerous documents and speeches by the SEC and its staff, warned auditors to focus their attention on improper revenue recognition practices during the Class Period.   Nonetheless, WS issued unqualified audit opinions on Cryo-Cell's 1998, 1999, 2000, 2001 and 2002 financial statements when the Company's revenue recognition practices violated GAAP, as Cryo-Cell has now admitted.

200.   Indeed, the recklessness of WS during the Class Period is also illustrated by the opinions issued by WS on Cryo-Cell's financial statements filed with the SEC during the Class Period, which, on their face, were in error.   In so doing, WS violated GAAS

General Standard No. 3 which that requires that due professional care must be exercised by the auditor in the preparation of his audit report.

201. For example, WS' audit opinion dated February 4, 2000 was filed with the SEC in Cryo-Cell's fiscal 1999 Form 10-KSB. Although such Form 10-KSB included the Company's fiscal 1999 and 1998 financial statements, WS' audit report erroneously opined on the Company's prior year (fiscal 1998 and 1997) financial statements. As a result, and in violation of SEC regulations, Cryo-Cell's fiscal 1999 financial statements were not covered by an audit report until it filed its fiscal 2000 Form 10-KSB, which included WS' audit opinion on Cryo-Cell's fiscal 2000 and 1999 financial statements.

202. In addition, Cryo-Cell's fiscal 2002 Form10-KSB contain WS' audit opinion dated February 28, 2003 on its fiscal 2002 and 2001 financial statements. Shortly thereafter, Cryo-Cell filed an amended Form 10-KSB in which it indicated that the correct date of WS' audit opinion on CRYO-Cell's fiscal 2002 financial statements was February 20 and not February 28 of 2003.

203. As a result, WS violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in the preparation of the audit report.

204. During the Class Period, the following unqualified false and misleading WS audit reports, which stated that Cryo-Cell's financial statements were presented in conformity with GAAP and that WS' audit was performed in accordance with GAAS, were filed with the SEC: [17]

1998

---

[17]  WS unqualified audit report on Cryo-Cell's restated fiscal 2002 financial statements was also false and misleading in that Cryo-Cell improperly accounted for the "correction" of its recognition of enrollment fee revenue as detailed herein.

We have audited the accompanying consolidated balance sheets of CRYO-CELL International, Inc. and subsidiaries as of November 30, 1998 and 1997, and the related consolidated statements of operations, shareholder's equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

We believe that our audits provide a reasonable basis for our opinion. In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of CRYO-CELL International, Inc. and subsidiaries as of November 30, 1998 and 1997, and the consolidated results of their operations and their cash flows for the years then ended in conformity with generally accepted accounting principles.

<u>1999 and 2000</u>

We have audited the accompanying consolidated balance sheets of Cryo-Cell International, Inc. and subsidiaries as of November 30, 2000 and 1999, and the related consolidated statements of operations and comprehensive loss, stockholders' equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Cryo-Cell International, Inc. and subsidiaries as of November 30, 2000 and 1999, and the consolidated results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

<u>2001</u>

We have audited the accompanying consolidated balance sheets of CRYO-CELL International, Inc. and subsidiaries as of November 30, 2001 and 2000, and the related consolidated statements of operations and comprehensive income (loss), cash flows and stockholders' equity for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CRYO-CELL International, Inc. and subsidiaries as of November 30, 2001 and 2000, and the consolidated results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

<u>2002</u>

We have audited the accompanying consolidated balance sheets of CRYO-CELL International, Inc. and subsidiaries as of November 30, 2002 and 2001, and the elated consolidated statements of operations and comprehensive loss, cash flows and stockholders' equity for the years then ended.   These financial statements are the responsibility of the Company's management.   Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CRYO-CELL International, Inc. and subsidiaries as of November 30, 2002 and 2001, and the consolidated results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the financial statements, in 2002 the Company changed its method of accounting for intangible assets.

205.   WS knew or recklessly disregarded that its unqualified audit opinions on Cryo-Cell's fiscal 1998, 1999, 2000, 2001 and 2002 financial statements were false and misleading because Cryo-Cell's financial statements had not been prepared in conformity with GAAP for the reasons alleged herein.

206.   In certifying such financial statements, WS also falsely represented that its audit was conducted in accordance with GAAS.  These statements were materially false and misleading in that the audit conducted by WS was knowingly or recklessly not performed in accordance with GAAS in the following respects:

> a.  WS violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP.  WS's opinion falsely represented that Cryo-Cell's 1998, 1999, 2000, 2001 and 2002 financial statements were presented in conformity with GAAP when they were not for the reasons herein alleged;

b. WS violated GAAS Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. WS was required to have stated that no opinion could be issued by it on Cryo-Cell's 1998, 1999, 2000, 2001 and 2002 financial statements or issued an adverse opinion stating that such financial statements were not fairly presented. WS also failed to require Cryo-Cell to restate is fiscal 2001 and 2002 year-end financial statements to correct the Company's improper reporting of marketing and licensing, royalty and enrollment fee revenue and uncollectible accounts receivable and allowed Cryo-Cell to make material financial misrepresentations to its shareholders and the public during the Class Period. WS' failure to make such a qualification, correction, modification and/or withdrawal of its audit opinions was a violation of GAAS, including the fourth standard of reporting;

c. WS violated GAAS General Standard No. 2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment;

d. WS violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements;

e.  WS violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the audit report;

f.  WS violated GAAS Standard of Field Work No. 2 which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed.  AU § 150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures.  AU § 319.02.  The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, structure and sets the tone of an organization.  After obtaining an understanding of an entity's internal control structure, the auditor assesses the entity's control risk.  AU § 319.02.  Control risk is the risk that a material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures.  AU § 319.29.  The ultimate

purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.   AU § 319.61.  The failure to properly evaluate the Company's internal control procedures associated with the recognition of  revenue and uncollectible accounts receivable was a violation of GAAS;

g. WS violated Standard of Field Work No. 3, which requires sufficient competent evidential matter to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit; WS knew or recklessly disregarded that it did not obtain sufficient competent evidential matter as to Cryo-Cell's reported Class Period revenues, uncollectible receivables or financial statement disclosures.  Indeed, E&Y questioned the priority of the Company revenue recognition practices after being retained for only a few weeks and without the benefit of a detailed audit or review of the Company's financial statements;

h. WS violated auditing standard AU § 342 in that it failed to perform the audit procedure required to determine that Cryo-Cell's accounting estimates, including the Company's reserve for uncollectible accounts receivable, were adequate.  AU § 342 provides that in establishing the reasonableness of an accounting estimate, the auditor normally concentrates on key factors and assumptions including the significance of the accounting estimate and its susceptibility to misstatement and bias.  As noted above, GAAP requires an entity's bad debt reserve to reflect, at

a given point in time, the estimated probable loss inherent in the entity's accounts receivable and further provides that events that occur subsequent to the balance sheet date, but prior to the issuance of the financial statements, provide additional evidence with respect to conditions that existed on the balance sheet date and affect the estimates inherent in the process of preparing financial statements. Nonetheless, during the Class Period, WS falsely certified that Cryo-Cell's receivables, **the due date of which was repeatedly extended, remained uncollected for years and not reserved for uncollectiblity,** were fairly stated, when they were not, as WS knew or recklessly disregarded;

i.  WS violated auditing standard AU § 431 which provides that if management omits from the financial statements, including the accompanying notes, information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and should provide the information in his report;

j.  WS violated auditing standard AU § 330 which requires auditors to confirm accounts receivables. Had it done so, WS would have learned, if it didn't already know, about the problems associated with the sale of rights associated with the Company's non-functioning and untenable U-Cord technology; and

k.  WS violated auditing standard AU § 508 which requires auditors to issue a qualified or adverse opinion when an inappropriate accounting principle causes a client's financial statements to be materially misstated.

207.   WS' opinions, which represented that each of Cryo-Cell's 1998, 1999, 2000, 2001 and 2002 financial statements were presented in conformity with GAAP, were materially false and misleading because WS knew or was reckless in not knowing that such financial statements violated the principles of fair reporting and GAAP.   In the course of rendering its unqualified audit certifications on Cryo-Cell's 1998, 1999, 2000, 2001 and 2002 financial statements, WS knew it was required by GAAS to obtain reasonable assurance about whether the financial statements were free of material misstatement and was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP.   WS also was required by GAAS to exercise professional skepticism, a process that requires a questioning mind, including an increased recognition of the need to corroborate management representations and explanations. WS, in issuing and reissuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certification knowing or recklessly disregarding that GAAS had been violated.

208.   Indeed, GAAS, in AU § 508, provides that "[d]uring the audit of the current-period financial statements, the auditor should be alert for circumstances or events that affect the prior-period financial statements presented ... or the adequacy of informative disclosures concerning those statements....   In updating his or her report on the prior-period financial statements, the auditor should consider the effects of any such circumstances or events coming to his or her attention."

209.   WS' unqualified opinion on Cryo-Cell's amended fiscal 2002 and 2001 year-end financial statements updated and reaffirmed WS' unqualified opinion on Cryo-Cell's fiscal 2001 year-end financial statements, *despite the fact that such financials were not restated to correct the Company's improper accounting for its marketing and licensing rights revenue, its enrollment fee revenue and its then uncollectible accounts receivable as alleged herein.* At the time WS reaffirmed is unqualified opinion on Cryo-Cell's fiscal 2001 year-end financial statements in the summer of 2003, more than $350,000 of Cryo-Cell's receivables *from 1999* were still uncollected. Moreover, Cryo-Cell's Board of Directors had received numerous letters outlining the long-standing and ongoing material deficiencies associated with its U-Cord technology. *In fact, Cryo-Cell's August 31, 2002 financial statements disclosed that "the Company received a letter from [COLTEC, Ltd.] stating that the Company had not fulfilled its obligations under the licensing agreement." Accordingly, WS was on constructive notice, if it didn't already know, that Cryo-Cell's recognition of millions of dollars in licensing revenue during the Class Period may have been improper.*

210.   Nonetheless, WS improperly failed to take the steps required by GAAS in connection with Cryo-Cell's failure to correct its misstated fiscal 2001 and 2002 year-end financial statements.

211.   As a result of its failure to accurately report on Cryo-Cell's Class Period financial statements, WS utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and

<u>Independent Accountants</u>, Securities Act Release No. 6341, Exchange Act Release No.

18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. <u>Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised</u>. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

(Emphasis added.)

212. WS describes itself on its website, <u>www.wslco.com</u>, as having "extensive

financial and business acumen to help [its clients] succeed and grow [their] business."

213. On its website, under the section entitled "Greetings" WS further claims the

following:

> **We take pride in our ability to personally understand the needs of our clients, their businesses and their goals.** Our total commitment translates into value added services and continued advantages for your business and personal financial needs.
>
> \*      \*      \*
>
> **Because we take the time to understand our clients' needs**, WSL professionals produce real value **by staying continually in touch with your financial and business situation.** We leverage this knowledge in combination with our financial expertise and wide ranging business experience to help you make practical decisions and formulate realistic plans.

(Emphasis added.)

214. Furthermore, when describing its Services, WS' website states:

Our experienced in-house staff has the skills to deliver the full range of services you may require now or later - consulting, auditing, accounting, tax, capital formation, data processing... **We know our clients well, and they know they can rely on us for advice and assistance.** Because we function as a team, our clients gain the resources and wealth of experience of the entire firm.

Quality Service is primary. We strive to provide the services you need in the most cost-effective manner possible; while never compromising the quality of our service. If problems are discovered, they are dealt with expeditiously and efficiently.

*     *     *

Accounting and auditing activities are sometimes thought of as sterile requirements of doing business. **We add real value by understanding your business from an insider's perspective.** We use that active knowledge, combined with our financial expertise to help you make practical decisions and formulate realistic plans.

Our accounting, auditing and management consulting services include:

- audits, reviews, or compilation of financial statements.
- budgets, projections, and forecasts
- compliance and controls for the securities industry

(Emphasis added.)

215.   WS touts its ability to understand its clients business "from an insider's perspective." It prides itself on the knowledge it has of its clients' business. It is evident from the services WS claims to provide its clients, WS would have had an intimate "insider's" knowledge of Cryo-Cell and its business operations. As such, WS should have known of the difficulties Cryo-Cell was experiencing with its CCEL-II unit, its uncollected receivables, its improper revenue recognition practices, its problem with its European affiliate, and the other issues described herein.

**VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE**

- 115 -

216.   At all relevant times, the market for Cryo-Cell's common stock was an efficient market for the following reasons, among others:

    a. Cryo-Cell's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b. As a regulated issuer, Cryo-Cell filed periodic public reports with the SEC and the NASDAQ;

    c. Cryo-Cell regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d. Cryo-Cell was followed by securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

217.   As a result of the foregoing, the market for Cryo-Cell's common stock promptly digested current information regarding Cryo-Cell from all publicly available sources and reflected such information in Cryo-Cell's stock price. Under these circumstances, all purchasers of Cryo-Cell's common stock during the Class Period suffered similar injury through their purchase of Cryo-Cell's common stock at artificially inflated prices and a presumption of reliance applies.

218. The graphs provided in paragraph 36 further support the efficiency of the market for Cryo-Cell common stock. As can be seen in those graphs, significant events were closely followed by increases or decreases in Cyro-Cell's stock price and trading activity. For example, in Graph 1, the damaging *St. Petersburg Times* article was accompanied by a significant increase in trading activity and decrease in stock price on the same day the article was published. The next day, when Cryo-Cell issued press releases to mitigate the damage and reassure investors, there was an increase in the Company's stock price and elevated volume of trading.

## VII.   NO SAFE HARBOR

219. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Cryo-Cell who knew that those statements were false when made.

## VIII.   CAUSES OF ACTION

**A.   COUNT I:   Violation Of Section 10(b) Of The Exchange Act Against And Rule 10b-5 Promulgated Thereunder Against All Defendants**

220.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-219 above as if fully set forth herein.

221.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Cryo-Cell's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

222.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Cryo-Cell's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

223.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Cryo-Cell as specified herein.

224.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cryo-Cell's value and performance and continued substantial growth, which included the making of or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Cryo-Cell and its business operations and future business prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Cryo-Cell common stock during the Class Period.

225.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the Individual Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (3) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of the Individual Defendants was aware of the Company's

dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

226.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cryo-Cell's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the Individual Defendants' overstatements and misstatements of the Company's business prospects, operations and financial condition throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

227.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Cryo-Cell's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Cryo-Cell 's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants and the Individual Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public

statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Cryo-Cell common stock during the Class Period at artificially high prices and were damaged thereby.

228.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Cryo-Cell's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Cryo-Cell common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

229.   By virtue of the foregoing, Defendants, including each of the Individual Defendants, have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

230.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**B.   COUNT II:   Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants**

231.   Plaintiff repeats and realleges each and every allegation of paragraphs 1-230 contained above as if fully set forth herein.

232.   The Individual Defendants acted as controlling persons of Cryo-Cell within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial

statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

233.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

234.   As set forth above, Cryo-Cell and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: April 26, 2004

Respectfully submitted,

**CAULEY GELLER BOWMAN
& RUDMAN, LLP**

By: *Robert J. Robbins*

David J. George, Trial Counsel
Florida Bar No. 0898570
dgeorge@cauleygeller.com
Robert J. Robbins
Florida Bar No. 0572233
rrobbins@cauleygeller.com
197 S. Federal Highway, Suite 200
Boca Raton, FL   33430
Telephone:   (561) 750-3000
Facsimile:    (561) 750-3364

-and-

Samuel H. Rudman
David A. Rosenfeld
Mario Alba Jr.
200 Broadhollow Road, Suite 406
Melville, NY 11747
Telephone:   (631) 367-7100
Facsimile:    (631) 367-1173

- 123 -

**FEDERMAN & SHERWOOD**
William B. Federman
120 N. Robinson Avenue, Suite 2720
Oklahoma City, OK 73102
Telephone:   (405) 235-1560
Facsimile:   (405) 239-2112

**Lead Counsel for Consolidated Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of April, 2004, a true and correct copy of the foregoing has been sent via U.S. First Class Mail to the parties listed on the attached service list.

Robert J. Robbins

## SERVICE LIST

Tracy A. Nichols, Esq.
**HOLLAND & KNIGHT LLP**
701 Brickell Ave., Suite 3000
P.O. Box 015441
Miami, FL  33131

Andrew Brian Albritton, Esq.
**HOLLAND & KNIGHT LLP**
100 N. Tampa ST.,  Suite 4100
P.O. Box 1288
Tampa, FL  33601

*Attorneys for Defendants Dearth and Hargiss*


Stanley H. Wakshlag
Brian P. Miller
**AKERMAN SENTERFITT &**
   **EIDSON, P.A.**
One Southeast Third Ave., 28th Floor
Miami, FL  33131

*Attorneys for Defendant Cryo-Cell International, Inc.*


Joseph B. Donnelly
**BROAD AND CASSEL**
AmSouth Building
100 N. Tampa Street, Suite 3500
Tampa, FL  33602

Joel M. Wolosky
**BONDY AND SCHLOSS LLP**
60 E. 42nd Street
New York, NY  10165

*Attorneys for Defendants Weinick Sanders Leventhall & Co., LLP and
Mirksy, Furst & Associates, P.A.*


Mark Bideau, Esq.
**GREENBERG TRAURIG P.A.**
777 South Flagler Drive, Suite 310E
West Palm Beach, FL  33401-6161

**MERCEDES WALTON**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761

*and*

2 Krista Court
Mendham, New Jersey 07945


**GERALD F. MAASS**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761

*and*

9517 Aqua Lane
Odessa, Florida  33556


**JILL M. TAYMANS**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761

*and*

153 Wood Creek Drive, N.
Safety Harbor, FL 34695


**EDWARD W. MODZELEWSKI**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761


**FREDERICK C. S. WILHELM**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761

*and*

35 Bedford Avenue
Buffalo, NY 14216-3508

**JUNIOR WINOKUR**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761


**DANIEL D. RICHARD**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761

*and*

305 Rim Shadows Drive
Sedona, AZ 86336-3459


**RONALD B. RICHARD**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761


**CHARLES D. NYBERG**
c/o Cryo-Cell International, Inc.
3165 McMullen Booth Rd., Bldg. 5
Clearwater, Florida  33761

*and*

209 Painted Cliffs Dr.
Sedona, Arizona  86336